[No. H035444. Sixth Dist. Apr. 27, 2012.]

SARA COLE et al., Plaintiffs and Appellants, v.
TOWN OF LOS GATOS et al., Defendants and Respondents.

**COUNSEL**

Walkup, Melodia, Kelly & Schoenberger, Michael A. Kelly, Spencer J. Pahlke; Smith & McGinty, Daniel U. Smith and Valerie T. McGinty for Plaintiffs and Appellants.

Howard Rome Martin & Ridley, Joseph C. Howard, Jr., Todd H. Master and Melissa M. Holmes for Defendant and Respondent.

## OPINION

**RUSHING, P. J.**—After attending a baseball game at Blossom Hill Park in Los Gatos, plaintiff Sara Cole returned to her vehicle, which she had parked between the north edge of the park and Blossom Hill Road. While standing near the back of her vehicle she was hit by a car driven by defendant Lucio Rodriguez, who would eventually plead guilty to driving while intoxicated. Plaintiff brought suit against Rodriguez and the Town of Los Gatos (Town), alleging as to the latter that the road and the area where she had parked—both of which were Town property—were in a dangerous condition because their configurations, coupled with their relative locations, induced park visitors to park where she had parked while inducing eastbound drivers on Blossom Hill Road to drive through that area in order to bypass stalled traffic on the road. The trial court granted Town's motion for summary judgment, finding no evidence that any dangerous condition of Town's property was a proximate cause of plaintiff's injuries. We hold that, on the contrary, the evidence before the trial court raised numerous issues of fact concerning the existence of a dangerous condition and a causal relationship between the characteristics of the property and plaintiff's injuries. We will therefore reverse the judgment.

## BACKGROUND

The accident occurred on the afternoon of September 9, 2007.[1] Plaintiff had diagonally parked her GMC Tahoe, a sport utility vehicle over 18 feet long, in a graveled strip running between the north edge of the park and Blossom Hill Road. The road, the park, and the graveled strip all belong to Town. At the moment of impact plaintiff was loading a bicycle into the rear of the vehicle. As she did so, Rodriguez, who had been driving eastbound on Blossom Hill Road after consuming either whiskey or a winelike beverage mixed with juice, left the road and entered the graveled area, where he collided with plaintiff, inflicting serious injuries. After stopping briefly, Rodriguez drove home to see his wife because he expected to be arrested and imprisoned as a repeat drunk driver.

Plaintiff presented evidence that just before the accident, eastbound traffic on Blossom Hill Road had been brought to a stop next to the graveled area to wait for another eastbound driver, Carrie Cummings, to make a left turn into her driveway across the road from where plaintiff was parked. Plaintiff

---

[1] Also present, apparently, were three of plaintiff's sons. They have joined her in this action, alleging that they suffered emotional distress as a result of witnessing the accident. Because their claims stand or fall with hers, we will for convenience generally speak of the matter as if only she had sued.

theorized that Rodriguez had left the road in an attempt to bypass these cars. No witness actually saw him do so, but plaintiff presented evidence, discussed in more detail below, that such maneuvers were common at that location, as was the practice of diagonal parking in the graveled area, and that Town had notice of these facts. Plaintiff also presented the lay opinion of Cummings, to which no objection was lodged, that her perception of events was most consistent with Rodriguez's having left the road to bypass stalled traffic.

Cole filed a complaint for damages against Rodriguez and Town, alleging that her injuries were the proximate result of both Rodriguez's negligent driving and a dangerous condition of public property. Town was alleged to have created or maintained a dangerous condition by, among other things, "fail[ing] to provide adequate time and distance for safe merging of the lanes of traffic," "fail[ing] to provide a reasonable and effective barrier between the roadway travel surface and the parking area" or, alternatively, to "prohibit or limit parking in the area," "fail[ing] to properly construct, maintain, and isolate the parking area from the roadway consistent with reasonable traffic engineering principles," failing to provide "reasonably required protective barriers, curbs, or bollards," "fail[ing] to safely design, construct, and maintain the area for parking," "fail[ing] to sign, warn, or notify Claimants and other foreseeable users of the danger existing at the site of the injury," "fail[ing] to provide and/or maintain adequate lane channelization, signals, devices, and pavement striping so as to create a trap," "fail[ing] to ensure that the roadway merge was not visually confusing, misleading, and dangerous," and "fail[ing] to remedy the hazardous condition prior to Claimants' injuries in light of: pre-collision complaints, accident history, and traffic volume." These factors, plaintiff alleged, "individually and in combination, constituted a dangerous condition that should have been, but was not, remedied or warned of" by Town's agents.

Town moved for summary judgment on several stated grounds.[2] As will appear, nearly all of its arguments fall back on the premise that plaintiff is unable to establish that any characteristic of the property was a proximate cause of her injuries. Plaintiff countered with, among other things, the declaration of a traffic expert opining upon various deficiencies in the configuration of the road and graveled area and their causal role in the accident. Town objected to much of this declaration on grounds of relevancy and lack of foundation. The trial court sustained many of Town's objections and granted summary judgment, ruling that plaintiff had not presented "any admissible evidence

---

[2] In its notice of motion Town asserted that (1) there was "no evidence of a dangerous condition of public property"; (2) there was "no evidence that any dangerous condition of public property caused plaintiffs['] injuries"; (3) there were "no facts giving rise to a special relationship between the Town and the plaintiffs"; and (4) it was immune from liability.

that demonstrates . . . the existence of a physical deficiency in the subject public property, or [that] such defect actually caused or contributed to the third party conduct that injured Cole."

Plaintiff brought a motion for new trial, which the trial court denied. This timely appeal followed.

DISCUSSION

## I. *Introduction*

A party can obtain summary judgment only by establishing the merit of his case "as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) The phrase "as a matter of law" is another way of saying that the evidence available to the parties, and placed before the court in support of and in opposition to the motion, raises no material issue that a trier of fact could resolve in favor of the party opposing the motion. The function of the motion is thus to provide a mechanism, short of trial, for "cut[ting] through the parties' pleadings in order to determine whether . . . trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493]; see *Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, 203 [48 Cal.Rptr.2d 448].) A moving defendant establishes a right to summary judgment by showing that the plaintiff lacks the evidence to sustain one or more elements of the cause of action pleaded by him or to overcome some defense the defendant is prepared to prove. (Code Civ. Proc., § 437c, subd. (*o*)(2).) Every meritorious motion thus rests on establishing two propositions: The opposing party is unable to present evidence in support of a specified fact, and that fact is essential to establish his cause of action or to overcome a defense. The first proposition may of course be established by uncontroverted affirmative proof that the specified fact does not exist, but it may also be established by showing that the opposing party bears the burden of proof with respect to the specified fact and that he has no evidence with which to carry that burden. In either case, once the first proposition is established—the unprovability of the specified fact—the only question presented is whether that fact is indeed vital to the opponent's case. This is a question of law for the court. If the answer is affirmative—if there is no way for the opposing party to prevail without the specified fact—the movant is entitled to judgment "as a matter of law."

The plaintiff can defeat a defense motion for summary judgment by showing either that the defense evidence itself permits conflicting inferences

as to the existence of the specified fact, or by presenting additional evidence of its existence. (See Code Civ. Proc., § 437c, subds. (c), (p)(1).) The dispositive question in all cases is whether the evidence before the court, viewed as a whole, permits only a finding favorable to the defendant with respect to one or more necessary elements of the plaintiff's claims—that is, whether it negates an element of the claim "as a matter of law." (§ 437c, subd. (c).)

Because summary judgment can raise only questions of law, we review the trial court's ruling without deference. (*Buss v. Superior Court* (1997) 16 Cal.4th 35, 60 [65 Cal.Rptr.2d 366, 939 P.2d 766]; *Orrick Herrington & Sutcliffe v. Superior Court* (2003) 107 Cal.App.4th 1052, 1056 [132 Cal.Rptr.2d 658]; *Iverson v. Muroc Unified School Dist.* (1995) 32 Cal.App.4th 218, 222 [38 Cal.Rptr.2d 35]; *Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 878 [116 Cal.Rptr.2d 158].) And because summary judgment presents a risk of infringing on the opponent's rights—particularly the right to a jury trial—we must strictly scrutinize the moving party's proofs while liberally construing those of the opposing party. "All doubts as to whether any material, triable issues of fact exist are to be resolved in favor of the party opposing summary judgment." (*Barber v. Marina Sailing, Inc.* (1995) 36 Cal.App.4th 558, 562 [42 Cal.Rptr.2d 697].)

■ The first step in analyzing any motion for summary judgment is to identify the elements of the challenged cause of action or defense in order to isolate those targeted by the motion. Plaintiff's cause of action against Town is defined by statute, specifically the portion of the Government Claims Act entitled Liability of Public Entities and Public Employees. (Gov. Code, §§ 814–895.8, added by Stats. 1963, ch. 1681, § 1, pp. 3266–3284; see *City of Stockton v. Superior Court* (2007) 42 Cal.4th 730, 741–742 [68 Cal.Rptr.3d 295, 171 P.3d 20].) These statutes declare a general rule of immunity (Gov. Code, § 815) and then set out exceptions to that rule. Plaintiff invokes the exception for a dangerous condition of public property, as set out in Government Code section 835 (section 835).[3] As there laid out, the cause of

---

[3] Government Code section 835 provides: "Except as provided by statute, a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:

"(a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or

"(b) The public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition."

action consists of the following elements: (1) a dangerous condition of public property; (2) a foreseeable risk, arising from the dangerous condition, of the kind of injury the plaintiff suffered; (3) actionable conduct in connection with the condition, i.e., either negligence on the part of a public employee in creating it, or failure by the entity to correct it after notice of its existence and dangerousness; (4) a causal relationship between the dangerous condition and the plaintiff's injuries; and (5) compensable damage sustained by the plaintiff.

Town was entitled to summary judgment if it demonstrated either that plaintiff was unable to prove one of these elements or that Town possessed "a complete defense to [plaintiff's] cause of action." (Code Civ. Proc., § 437c, subd. (p)(2); see *id.*, subd. (n).) The only defense argued in support of the motion was the general statutory immunity of public entities against liability for torts.[4] (See Gov. Code, § 815, subd. (a).) This assertion added nothing of substance to the motion; it was simply another way of stating that plaintiff could not establish all of the statutorily defined elements of liability.

Another of the grounds Town asserted for the motion—the absence of a "special relationship" between Town and plaintiff—may also be disregarded as a distinct basis for summary judgment. It is not an independent defense, sufficient in its own right to defeat plaintiff's claims, but an anticipatory rebuttal to certain claims plaintiff might make—specifically, that Town owed her a heightened duty under cases predicating such a duty on a "special relationship." (See *Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1129 [119 Cal.Rptr.2d 709, 45 P.3d 1171] (*Zelig*); *Avila v. Citrus Community College Dist.* (2006) 38 Cal.4th 148, 158 [41 Cal.Rptr.3d 299, 131 P.3d 383]; *Lopez v. Southern Cal. Rapid Transit Dist.* (1985) 40 Cal.3d 780, 788–791 [221 Cal.Rptr. 840, 710 P.2d 907]; *Constantinescu v. Conejo Valley Unified School Dist.* (1993) 16 Cal.App.4th 1466, 1472–1473 [20 Cal.Rptr.2d 734].) Since plaintiff placed no reliance on such a relationship, Town's denial of that premise cannot provide a sufficient basis for the judgment under review.

It thus appears that the only colorable grounds for the motion were that plaintiff was unable to establish two elements of her cause of action: a dangerous condition of public property, and a causal relationship between that condition and plaintiff's injuries. The question on appeal is whether the

---

[4] Town cited several specific immunity statutes in passing, but offered no argument in support of their application. Town's brief on appeal also asserts in passing that Town is "protected by design immunity (Govt. Code §830.6) and discretionary immunities (Govt. Code §815.2(d) [*sic:* (b)] & Govt. Code §820.2)." These defenses may well defeat some theories of liability that plaintiff might otherwise assert, but Town made no attempt to establish them as a ground for summary judgment.

evidence before the trial court established the absence of a triable issue of fact with respect to either of these elements.

## II. *Dangerous Condition of Public Property*

### A. *Plaintiff's Theory*

A "dangerous condition" for present purposes is "a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used." (Gov. Code, § 830, subd. (a) (section 830(a)).) "The existence of a dangerous condition ordinarily is a question of fact, but the issue may be resolved as a matter of law if reasonable minds can come to only one conclusion." (*Zelig, supra,* 27 Cal.4th 1112, 1133; accord, *Bonanno v. Central Contra Costa Transit Authority* (2003) 30 Cal.4th 139, 148 [132 Cal.Rptr.2d 341, 65 P.3d 807] (*Bonanno*).) To establish a qualifying condition, the plaintiff must point to at least one " 'physical characteristic' " of the property. (*Sun v. City of Oakland* (2008) 166 Cal.App.4th 1177, 1187 [83 Cal.Rptr.3d 372].) However the *location* of property may constitute a qualifying characteristic. (*Bonanno, supra,* 30 Cal.4th at p. 154; see *id.* at pp. 144, 146, 149–151.) Further, as the statutory language makes clear, a qualifying risk need not be one posed to users of the public property; it may be a hazard presented to users of "adjacent property." (§ 830(a).) It follows that, since all of the property involved here belonged to Town, a dangerous condition might consist of any characteristic of any part of that property that foreseeably endangered users of any other part.

Plaintiff's theory is essentially that the configuration of Blossom Hill Road and the adjacent gravel area created a danger to users of the latter in that eastbound drivers on Blossom Hill Road were often induced to leave the road (as Rodriguez did) and enter the graveled area, where they posed an obvious hazard to persons who had parked there (as plaintiff did), and particularly those standing near the rear of a vehicle parked diagonally, as was the custom. Of course there is always a risk that a vehicle operated on a highway may leave the road *by accident.* But according to plaintiff's theory, it was a common practice for drivers to do so here, quite deliberately, in order to bypass stopped traffic.

This premise was amply supported by evidence. Carrie Cummings, the local resident who had just turned left into her driveway when the accident here occurred, declared that "[n]early every time" she executed such a turn with cars behind her, someone would pass on the right. Sharon Perry, a regular user of the park who often parked in the graveled area, declared that

eastbound drivers frequently turned left or executed U-turns in this area, and that three-quarters of the times this happened, "another driver passe[d] the turning driver on the right." Debbie Fumia, another frequent user of the park, estimated that she witnessed such a maneuver "at least 1 time each week during the baseball season." William Cole declared that "[e]very one or two weeks," he "would see an eastbound vehicle on Blossom Hill Road pass . . . [a] left-hand turning driver[], and the cars stacked up behind, on the right by driving at least part of the way through the gravel area near where [plaintiff] was injured."

Plaintiff also presented ample evidence that the graveled area was located and configured in a manner that encouraged its use for parking by visitors to the park. Plaintiff's husband declared that over a period of seven years he had visited Blossom Hill Park at least 500 times, including some four times a week during baseball season; that the graveled area was "by far the most convenient location for parking for little league games"; and that cars were "always" parked there during such games. Dave Burt declared that he had visited Blossom Hill Park at least 450 times in connection with games at the baseball field there; that the area where plaintiff was injured provided much more convenient access to the baseball field than a parking area on the south side of the park; and that he parked in the northern area about half the times he visited the park. Five other park users made declarations to similar effect.

The evidence also supported a finding that the hazard posed by these two potentially conflicting uses was exacerbated by the fact that—again with tacit official approval—persons parking in the area customarily did so on the diagonal. Carrie Cummings testified that when cars were parked there for little league games, they "always" parked diagonally. Plaintiff presented similar averments from herself, her husband, and seven other local witnesses.

The foregoing evidence would seem to amply support a finding that a danger existed at the site of the accident of just the kind of injury plaintiff sustained. It would also support the attribution of this danger to the *physical characteristics* of the property. At least three such characteristics could be found to constitute an inducement or temptation for drivers to act as Rodriguez did: the presence of driveways across the street from the graveled area, which provided an occasion for some drivers to turn left, which in turn required them to stop and wait for oncoming traffic to clear; the absence of a second eastbound lane, which resulted in the formation of obstructions or stalls behind left-turning drivers; and the narrowness of the pavement, which made it impossible to pass such an obstruction on the right without entering the graveled area. In addition, plaintiff relied heavily on the holding of *Bonanno*, that a dangerous condition may arise from the *location* of public property or "its relationship to its surroundings" (*Bonanno, supra*, 30 Cal.4th

at p. 149; see *id.* at pp. 144, 146, 149–151, 154) including its "adjacency" to property on which an injury-producing condition exists (*id.* at p. 154, citing *Holmes v. City of Oakland* (1968) 260 Cal.App.2d 378 [67 Cal.Rptr. 197]; see Cal. Law Revision Com. com., reprinted at 32 West's Ann. Gov. Code (1995 ed.) foll. § 830, p. 299; 2 Van Alstyne et al., Cal. Government Tort Liability Practice (Cont.Ed.Bar 4th ed. 2002) Dangerous Condition of Public Property, § 12.18, p. 769).[5]

Plaintiff pointed to several other physical features that, according to her, contributed to the danger. A barrier fence at the west end of the graveled area was too short to prevent or discourage eastbound drivers from entering that area. At the same time, according to plaintiff, at least three characteristics of the graveled area induced park visitors to use it for parking. One was its proximity to the park. In addition, although Town had caused a fence to be constructed between the parking area and the park, it placed gaps in the fence at 50-foot intervals for the acknowledged purpose of providing direct entry into the park for people parking in the graveled area. Town also placed "No Parking" signs at two specific points in the parking area—near a fire hydrant and a vehicle access gate—and nowhere else. These signs reinforced the implication that parking in the graveled area was officially sanctioned.

### B. *Expert Opinion Testimony*

Plaintiff presented a declaration setting forth the opinions of traffic engineer Robert Shanteau concerning the hazards posed by the above characteristics as well as other more technical aspects of the road and graveled area. We are far from certain that this evidence was necessary to raise a triable issue of fact, but in the absence of a meritorious objection it was certainly *sufficient* to have that effect. The trial court sustained Town's objections to virtually the entire declaration, but this ruling appears insupportable.

At the heart of Shanteau's declaration was his opinion that "on the day of the collision, Blossom Hill Road at the place of this injury constituted a dangerous condition of public property" as the result of multiple factors, i.e., "the physical characteristics of the roadway, the traffic volumes, lane and shoulder widths, size and proximity of the merge leading into the one eastbound lane, the permitted angle parking adjacent to the park, the typical speeds on the roadway, and the permitted left turns into residential driveways on the north side of Blossom Hill Road at the point of the impact. The combination of these factors made just this type of collision more than simply foreseeable—it made such a collision likely."

---

[5] Although *Bonanno* was the decision cited most heavily in plaintiff's opposition memorandum below, it was not mentioned in Town's reply memorandum. Nor was it among the dozen or so cases cited in the trial court's order.

Shanteau explained the basis for this opinion in some detail. First he observed that as an arterial street, Blossom Hill Road should have been, in the words of Town's own engineering design standards, " 'designed to facilitate two or more lanes of moving traffic in each direction.' " Next he pointed to the fact that the second eastbound lane disappeared "just west of (i.e. before) the accident location," where "eastbound Blossom Hill Road transitions from two lanes with curb and gutter to one lane with an unpaved shoulder." Citing Vehicle Code section 21754, subdivision (b), he asserted that where this transition commenced, the paved portion of the road was wide enough to permit eastbound drivers to pass lawfully on the right. At the point of transition from pavement to gravel, however, there was nothing to prevent or deter drivers from continuing into the gravel strip where, in this instance, plaintiff's vehicle was parked. Shanteau acknowledged the existence of a barricade at the western end of this area, but observed that it did not extend "far enough to prevent an eastbound driver such as Mr. Rodriguez from driving between it and the eastbound travel lane to complete a pass or merge, including one that was started legally." Nothing told the driver who had commenced such a maneuver "that where he was intending to drive would stop being a paved merging lane and become an unpaved shoulder."

Shanteau further opined that the distance provided for the merge on Blossom Hill Road from two eastbound lanes did not satisfy the formula set forth in the state manual on traffic control devices. Town's engineer, Jessy Pu, had reached a contrary conclusion in a declaration supporting the motion for summary judgment, but Shanteau now took issue with nearly every component of Pu's calculation, including not only the correct method for applying the formula but the actual distances involved and the correct method for deriving them.

With respect to the graveled area, Shanteau opined that the openings in the fence and the placement of "no parking signs" in two select locations created a "de facto parking area," which failed in numerous respects to conform to governing laws and standards. State law required parallel parking by default in the absence of a resolution or ordinance expressly providing otherwise, but Town had neither adopted such an ordinance nor taken steps to prevent or discourage angle parking. (See Veh. Code, §§ 22502, 22503.) He also interpreted Town's engineering guide to require parallel parking, and he also discussed the issue from a perspective of general engineering principles, noting that angle parking presents "[s]pecial problems," "well know[n] to traffic engineers," due to "the varying length of vehicles and sight distance problems associated with vans and recreational vehicles." Thus, while "angle parking may be considered in special cases on collector streets," it "is not considered at all on arterial streets." Further, he opined, good traffic engineering principles require that parking spaces on arterials be paved in order to "encourage orderly and efficient use where parking turnover is substantial."

Under Town's own engineering standards, parking spaces should be marked, "which in turn requires that any angle parking area be paved." Those standards also require that an angle parking stall measure 28.4 to 33 feet in depth, depending on the angle. "Both of these dimensions exceed the actual distance at the location of the accident, which, according to the *Collision Report*, was 23' 1". Therefore, the angle parking . . . in the unpaved shoulder area did not meet the Town's own standards." He then noted that "cars parked at an angle in the unpaved shoulder area had to use the roadway of Blossom Hill Road as an access aisle. But since Blossom Hill Road is an arterial, use of the roadway as an access aisle to angle parking spaces is undesirable." Had the road been widened as planned in 1966, he declared, the graveled area would have been paved, and could have been marked for parallel parking. Had that been done, plaintiff "would have been out of the path of Mr. Rodriguez's vehicle and would not have been struck."

According to Shanteau there were "at least half a dozen ways the Town might have eliminated this dangerous condition," including by prohibiting angle parking, requiring parallel parking, prohibiting all parking, extending the existing barricade at the west end of the problem area "to a point where drivers will recognize there is no additional room to pass," extending the merge distance to comply with state guidelines "including a sign at the beginning of the tapered edge line saying DO NOT PASS," or "[c]onstructing a curb, gutter and sidewalk along Blossom Hill Road" as called for in the Town's own standards and plans. All of these measures, he declared, "have long been well known in the traffic engineering field, would have required little time or expense to implement, and would have eliminated this dangerous condition." In his opinion, "a reasonable traffic engineer for the Town of Los Gatos should have realized that the conditions present at the accident location created a dangerous condition where an accident was likely and remedial action or warning was necessary long before Sara Cole's injury to remedy that situation."

## C. *Objections*

Town managed to neutralize the probative potential of Shanteau's declaration by lodging a host of objections, several of which the trial court sustained. Insofar as these rulings have any bearing on the outcome, they were erroneous.

Town first objected to Shanteau's statements insofar as they concerned "[t]he facts 1) that the lanes merge; 2) the length of the merge; 3) the location where the merge begins and ends; and 4) the calculation of the proper merge distance." The grounds of objection were relevance, "speculation," and

"conclusor[iness]."[6] The latter two characterizations state a cognizable ground for exclusion, if at all, on the ground of *improper opinion*. The admissibility of expert opinion is governed primarily by Evidence Code section 801. That statute is cited nowhere in Town's objections to evidence. Insofar as Town asserted the opinion rule, its failure to make a coherent argument in support of the objection should be viewed as an abandonment of that objection.

More importantly, however, it is simply baffling that Town would object to these averments on any ground—and no such objection should even have been entertained—since Town had unmistakably opened the door to this evidence by offering averments in its moving papers from its traffic engineer, Jessy Pu, of exactly the same tenor, on exactly the same subject. Pu averred among other things that "[j]ust east of the stop light at Los Gatos Blvd. and Cherry Blossom Lane, Blossom Hill Road merges from two lanes to one eastbound lane." He then put forth a formula by which the proper merge distance should be calculated, and opined that "the merge from two lanes to one lane on Blossom Hill Road . . . met the suggested guideline." The challenged opinions by Shanteau were in the form of a direct rebuttal of these averments. Town can hardly be heard to question their relevance or propriety as expert opinion.

■ Indeed the relevance of these averments seems obvious even apart from their tendency to rebut Town's evidence. Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) A question of relevancy involves two subsidiary inquiries: whether the *fact sought to be shown* by the evidence is "material," i.e., within the issues properly tendered by a party and whether the proffered evidence actually *tends to prove* that fact. (See *People v. Hill* (1992) 3 Cal.App.4th 16, 29 [4 Cal.Rptr.2d 258], disapproved on another point in *People v. Nesler* (1997) 16 Cal.4th 561, 582, fn. 5 [66 Cal.Rptr.2d 454, 941 P.2d 87].) There seems no basis to doubt the *probative value* of Shanteau's averments. The question, if any, is their materiality. ■ In answering that question, the primary considerations are "the pleadings, the rules [of] pleading, and the substantive

---

[6] Town opens each objection by citing one or two rules of evidence but in the ensuing discussion manages to allude to perhaps half of the major principles in the Evidence Code. We believe that where a trial court is confronted on summary judgment with a large number of nebulous evidentiary objections, a fair sample of which appear to be meritless, the court can properly overrule, and a reviewing court ignore, *all* of the objections on the ground that they constitute oppression of the opposing party and an imposition on the resources of the court. We also note that an evidentiary objection is only preserved for review if it is "so stated as to *make clear* the *specific ground* of the objection." (Evid. Code, § 353, subd. (a), italics added.) Failure to comply with this requirement furnishes its own ground for overruling objections such as those before us.

law relating to the particular kind of case." (1 Witkin, Cal. Evidence (4th ed. 2000) Circumstantial Evidence, § 3, p. 324; see *People v. Steele* (2002) 27 Cal.4th 1230, 1263 [120 Cal.Rptr.2d 432, 47 P.3d 225].)

Here the evidence was offered to prove a dangerous condition of public property. The averments concerning the merger of lanes plainly had some bearing on that issue by supporting a finding that the configuration of Blossom Hill Road created hazards to users of the adjoining land. Town offers no intelligible basis to suppose otherwise. Nor did it offer any authority or argument concerning the law of evidence, the contents of the pleadings, or the law governing their interpretation. Instead it rested its relevance objection on the assertion that "[t]here is absolutely no evidence that the change from 2 lanes to 1 lane . . . played any part in *the cause of this accident*." The real gist of the objection, then, is not that the evidence failed to establish a dangerous condition, but that evidence of a dangerous condition was itself rendered immaterial by plaintiff's supposed inability to establish *another element* of the cause of action, i.e., proximate cause.

■ It might indeed be argued, as a matter of abstract logic, that when a party cannot prove one necessary element of his cause of action, evidence of other elements ceases to be "of consequence to the determination of the action." (Evid. Code, § 210.) But this is only because once the stated condition is established, the entire matter should be concluded against the party asserting that cause of action. At that point *all* further evidence, no matter who offers it, becomes inconsequential. The court should enter judgment forthwith; it certainly need not trouble itself with disputes over evidence. Here, if plaintiff was unable to establish causation there was no occasion to consider the relevance of its expert's opinions, or any other question, concerning the existence of a dangerous condition. Under the stated premise, Town was entitled to judgment without so much as a glance at the Evidence Code.

Town's relevance objection thus appears to constitute a peculiar kind of rhetorical periphrasis or circumlocution in which one argument (inadmissibility of evidence) is used as a kind of Trojan horse for another, quite different argument (lack of causation). Since Town elsewhere asserted the real point without any such disguise (see pt. III., *post*), the only effect of its assertion in a different guise—and the only apparent purpose—is to weigh down Town's presentation with additional verbiage. From the perspective of judicial efficiency, not to mention logical parsimony, this objection should have been disregarded as redundant and superfluous.[7]

---

[7] This stratagem, unfortunately, recurs throughout Town's presentation below and on appeal. An argumentative heading asserting some seemingly dispositive premise will be followed by a nonsyllogistic, inconclusive discussion of that premise culminating in a repetition of the claim

The pleadings clearly tendered the question whether a dangerous condition of public property existed at the location of plaintiff's injury. Evidence on that subject was plainly material and relevant. Town's suggestion to the contrary is at best a distraction from the real issues in the case.

In its second objection, also sustained, Town took exception to what it described as "unsupported speculation" by Shanteau "that Rodriguez was attempting to pass a line of stopped cars at the time of the accident." The grounds of objection, apparently, were "speculation," lack of foundation, and relevance. The first ground may be dismissed for reasons already stated. The third need not detain us either; Rodriguez's reasons for driving off the road were of course highly relevant, not only to the outcome of the action but more immediately to Shanteau's opinion that the dangerous condition of the road and roadside area was a cause of plaintiff's injuries.

■ The foundational objection requires a more nuanced analysis. An expert is entitled to base his opinion upon inadmissible matter, including factual propositions outside his personal knowledge, provided such matter is "of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates." (Evid. Code, § 801, subd. (b).) However, to the extent Shanteau relied on facts not personally known to him, those facts were necessarily *hypothetical*, i.e., his opinions *assumed* their existence. Much of the language targeted by the present objection was not couched in terms of assumptions or premises, nor attributed to any source outside Shanteau's personal knowledge, but took the form of absolute assertions of fact, e.g., that the collision occurred when Rodriguez "was passing several vehicles stopped behind a vehicle waiting to make a legal left turn . . . ." Assertions of matter outside Shanteau's personal knowledge, in such an unconditional, unattributed form, were indeed objectionable, if only to ensure that they were not inadvertently allowed to become proof of the stated facts. (See 3 Witkin, Cal. Evidence, *supra*, Presentation at Trial, § 393, pp. 484–485.)

■ But an objection on this ground goes only to the *purpose* for which the challenged statements may be received. The correct ruling is not to exclude them, but to admit them subject to appropriate limitations. In a jury trial of course the jury is instructed about these limitations; in the present setting the trial court need only confirm that it is not accepting the challenged statements as proof of the matters asserted, but only as a foundation for the accompanying opinions. But Town sought no such limited relief. Instead it set

---

that, in any event, plaintiff cannot establish proximate cause. A motion confined to that single ground might not have led the trial court into error and might not have generated this expensive and unnecessary appeal. Certainly it would have consumed fewer resources than Town's motion has.

out a highly fact-laden discussion of the testimony of Rodriguez and Carrie Cummings, the driver whose left turn into her driveway, according to plaintiff, furnished the occasion for Rodriguez to leave the roadway in an attempt to pass stopped cars. The objection eventually disclosed itself as merely an occasion to assert, yet again, that plaintiff had failed to establish "a causal connection between the alleged dangerous condition and Cole's injury." Town never addressed the question whether, setting this substantive question aside, Shanteau was entitled to rely on the stated factual premises in forming his opinion. Insofar as the objection was consequential, therefore, it should have been overruled.

We will not consume additional paper addressing the other objections sustained by the trial court, which were unsound for the same or similar reasons. They consist almost entirely of arguments about the merits of the controversy, not the admissibility of evidence.[8]

### D. *Merits*

Town's argument on the merits with respect to the existence of a dangerous condition is obscure at best. In a heading in its *statement of facts* Town asserts, "The Condition of Blossom Hill Road and the Gravel Shoulder Were [*sic*] Not Dangerous." But under this heading Town merely recites a number of facts—some of them controverted—concerning the configuration of the road and adjacent graveled area. Later Town falls back on the same periphrastic Trojan horse already noted. Time and again it seems on the verge of addressing the dangerous-condition element in a syllogistic manner, only to retreat instead into a claim that plaintiff cannot establish the element of *causation*. Thus immediately after a statement that the judgment is sound "because no reasonable person would conclude" that a substantial risk of injury was presented, we find the sentence "No defect in the roadway/shoulder *caused Cole's injury*." (Italics added.)

Nor does Town direct us to any cogent argument on this point in its papers below. Immediately after the foregoing passage it cites points in the record where it supposedly "addresses, in detail why elements . . . of Government Code section 835," including a dangerous condition of public property, "are not established." But in its original moving papers Town's discussion of the

---

[8] Town's 25 pages of objections to Shanteau's declaration are followed by another 13 pages entitled "Objections to *Statements in Plaintiffs' Memorandum* of Points and Authorities Unsupported by Evidence." (Italics added; capitalization modified.) It goes without saying that statements in a memorandum of points and authorities are not evidence. "Objections" to such statements are therefore ineffectual. Indeed the filing of such a document appears to offend rules limiting the length of memoranda on motions for summary judgment. (Cal. Rules of Court, rule 3.1113(d).)

dangerous-condition element consisted largely of summarizing a few cases with no attempt to explain their application to the facts here. This discussion culminated in a passage substantially identical to the one described above, in which Town explicitly abandons the dangerous-condition argument in favor of an assertion about causation.[9]

The nearest thing we find in Town's moving papers to a coherent argument on the subject of a dangerous condition is its allusion to the statutory requirement that the condition create a substantial risk of injury when "used with due care." (Gov. Code, § 830.) This is followed several pages later by the assertion that neither Rodriguez nor plaintiff was using the property with due care when the accident occurred—Rodriguez because he was driving while intoxicated, and plaintiff because she was parked diagonally, in supposed violation of state law. Town reprises these assertions in its brief on appeal, but neither here nor in the trial court is any attempt made to construct a syllogistic argument around them.

■ Nor does Town cite any authority for the implied premise that a failure to exercise due care by the plaintiff or a third person may preclude a finding of a dangerous condition of public property. This omission is understandable, because the governing law is exactly the opposite. The status of a condition as "dangerous" for purposes of the statutory definition does *not* depend on whether the plaintiff or other persons were actually exercising due care but on whether the condition of the property posed a substantial risk of injury to persons who *were* exercising due care. (*Morris v. State of California* (1979) 89 Cal.App.3d 962, 966 [153 Cal.Rptr. 117], fn. omitted ["a condition of public property is dangerous if it creates a substantial risk of harm when used with due care by the public generally, as distinguished from [a] particular person charged as a concurrent tortfeasor . . ."]; *Swaner v. City of Santa Monica* (1984) 150 Cal.App.3d 789, 799 [198 Cal.Rptr. 208] [plaintiff's negligence "is a defense which may be asserted by a public entity; it has no bearing upon the determination of a 'dangerous condition' in the first instance"]; *Ducey v. Argo Sales Co.* (1979) 25 Cal.3d 707, 718–719 [159 Cal.Rptr. 835, 602 P.2d 755] ["if the condition of its property creates a substantial risk of injury even when the property is used with due care, the state gains no immunity from liability simply because, in a particular case, the dangerous condition of its property combines with a third party's negligent conduct to inflict injury"]; Cal. Law Revision Com. com., reprinted at 32 West's Ann. Gov. Code, *supra*, foll. § 830, p. 299, italics added ["Although the condition will not be considered dangerous . . . unless it creates a hazard to those who foreseeably will use the property or adjacent

---

[9] Town also suggests that it negated the dangerous-condition element in its reply memorandum below, but it cites no particular pages from that memorandum and we see no such argument there.

property *with due care*, this does not require that the injured person prove that he was free from contributory negligence. Contributory negligence is a matter of defense under subdivision (b) of Section 815."].)

■ We conclude that, having presented no cogent argument on the question whether plaintiff could establish a dangerous condition of public property, Town failed to carry its burden of negating, as a matter of law, that element of plaintiff's cause of action.

III. *Causation*

Town's argument concerning causation is also less than pellucid, but we can identify four recurring factual themes: Rodriguez's intoxication, the supposed absence of any evidence that he left the road for the purpose of bypassing stopped traffic, his professed familiarity with Blossom Hill Road at the location in question, and the premise that an alternative configuration would have placed plaintiff at least as close to traffic as the existing configuration did. None of these themes furnishes a sound basis for the judgment under review.

■ Town repeatedly alludes to Rodriguez's inebriation, using the word "drunk" at least 20 times in the brief, and "intoxicated," or a form of that word, another 21 times. Indeed Town opens its brief with the sentence "Summary judgment was granted to the Town of Los Gatos because the accident was caused by a drunk driver who left the roadway due to intoxication." Given that Rodriguez pled guilty to drunk driving, there is little doubt that a jury would find he was indeed intoxicated. However the role of that fact in Town's motion—and the trial court's ruling—is far from clear. Concealed in the just quoted assertion is a supposition contrary to first-year tort law, i.e., that an injury can have only one cause, or that only one tortfeasor can be held liable for it. In fact, of course, it is entirely possible for an injury to result from multiple tortious acts or omissions, in which case all authors of the injurious conduct may be liable, provided the conduct of each satisfies the test of proximate or legal cause as that concept has evolved over the centuries. (See 6 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 1193, p. 568 et seq.; Rest.2d Torts, § 430 [referring to requirement as "legal cause"].) Thus Town could not establish an entitlement to summary judgment merely by showing that Rodriguez's inebriation was *a* cause of plaintiff's injuries. Rather it had to establish *as a matter of law* that plaintiff would be unable to present evidence that any condition of the public property where the accident occurred was *also* a substantial causative factor in bringing about her injuries.

The trial court's order seems to contemplate a rule of law under which Town cannot be liable for a dangerous condition of its property unless that

condition *caused Rodriguez's conduct.* Thus the court found no evidence to the effect that a defect in the property "actually caused or contributed to *the third party conduct that injured Cole.*" (Italics added.) The phrase "third party conduct" might refer either to Rodriguez's driving while intoxicated or his driving off the road. In neither case, however, does the court's formula accurately state the governing principles.

■ Under traditional tort principles, once a defendant's conduct is found to have been a cause in fact of the plaintiff's injuries, the conduct of a third party will not bar liability unless it operated as a superseding or supervening cause, so as to break the chain of legal causation between the defendant's conduct and the plaintiff's injuries. (See 6 Witkin, Summary of Cal. Law, *supra*, Torts, §§ 1197–1219, pp. 574–597.) The misconduct of a third party will not ordinarily have this effect if the misconduct itself was foreseeable to the defendant. (*Rosencrans v. Dover Images, Ltd.* (2011) 192 Cal.App.4th 1072, 1087 [122 Cal.Rptr.3d 22].) Cases have held that the risk posed by intoxicated drivers to persons near a roadway may be foreseeable in itself, so as to present a question of fact for the jury. (See *Bloomberg v. Interinsurance Exchange* (1984) 162 Cal.App.3d 571, 576–577 [207 Cal.Rptr. 853] [risk could be found foreseeable where stranded motorist was struck by intoxicated driver]; *Bigbee v. Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 58–59 [192 Cal.Rptr. 857, 665 P.2d 947] [same, plaintiff struck while inside telephone booth adjacent to roadway].)[10]

■ Even when a third party's intervening act is unforeseeable, the defendant's conduct may continue to operate as a legal cause if the defendant could reasonably foresee the *injury* resulting from his own conduct. " '[W]here [an] injury was brought about by a later cause of independent origin . . . [the question of proximate cause] revolves around a determination of whether the later cause of independent origin, commonly referred to as an intervening cause, was foreseeable by the defendant or, if not foreseeable, whether it caused the injury of a type which was foreseeable. If *either* of these questions is answered in the affirmative, then the defendant is not relieved from liability towards the plaintiff; if, however, it is determined that the intervening cause was not foreseeable *and* that the results which it caused were not foreseeable, then the intervening cause becomes a supervening cause and the defendant is relieved from liability for the plaintiff's injuries.' " (*Pappert v. San Diego Gas & Electric Co.* (1982) 137 Cal.App.3d 205, 210 [186 Cal.Rptr. 847], quoting *Akins v. County of Sonoma* (1967) 67 Cal.2d 185,

---

[10] Two cases decided before *Bigbee* arguably support a contrary rule, or at least a narrower one. (*Schrimscher v. Bryson* (1976) 58 Cal.App.3d 660 [130 Cal.Rptr. 125]; *Whitton v. State of California* (1979) 98 Cal.App.3d 235 [159 Cal.Rptr. 405].) Those decisions were limited to near invisibility in *Jackson v. Ryder Truck Rental, Inc.* (1993) 16 Cal.App.4th 1830, 1849–1852 [20 Cal.Rptr.2d 913], which interpreted them as resting on rules peculiar to injuries suffered or inflicted by public safety officers while on duty. This case presents no comparable feature.

199 [60 Cal.Rptr. 499, 430 P.2d 57]; accord, *Hardison v. Bushnell* (1993) 18 Cal.App.4th 22, 27 [22 Cal.Rptr.2d 106].)

If these principles govern here, then the trial court clearly erred, for nothing in this record would permit a conclusion that Rodriguez's conduct— either in driving after drinking, or in driving off the road—was, as a matter of law, a superseding cause relieving Town of any liability that might otherwise be imposed. The hazard posed by intoxicated drivers at the site of the accident might itself have been foreseeable, and even if it were not, nothing in this record would preclude a jury from concluding that both the nature of plaintiff's injury and the manner in which it was sustained were foreseeable. Even if it were shown to be unforeseeable that a *drunk* driver would collide with a person in plaintiff's position, it could be found foreseeable that a *sober* driver would do so, and many if not all of the measures necessary to protect against that risk would also have protected against the risk of injury from a drunk driver.

The trial court apparently considered none of these principles but instead applied a rule under which Rodriguez's conduct operated to supersede the effects of the posited dangerous condition of property unless that conduct was itself a direct product of the condition. Although such a requirement might be extracted from a handful of recent decisions, we believe the language supporting it should be viewed as a dictum—one which may have been understandable in its original context, but which does not represent an accurate statement of law when lifted from that context, and which does not overturn the traditional principles discussed above.

The language in question originated in *Zelig, supra,* 27 Cal.4th 1112, 1136, which arose from the fatal shooting of a litigant by her ex-husband inside a courthouse while awaiting a hearing on child and spousal support. In discussing the limits of public entity liability in such cases, the court wrote, "Other courts have pointed out that the defect in the physical condition of the property must have some *causal relationship* to the third party conduct that actually injures the plaintiff." (*Ibid.*) The court attributed the quoted language to two other decisions, *Constance B. v. State of California* (1986) 178 Cal.App.3d 200 [223 Cal.Rptr. 645] (*Constance B.*), and *Moncur v. City of Los Angeles* (1977) 68 Cal.App.3d 118 [137 Cal.Rptr. 239] (*Moncur*). (*Zelig,* at p. 1136.) Neither of them contains such language, however, and neither supports a rule requiring a direct causal link between a dangerous condition and the conduct of the third party, as distinct from the harm to the plaintiff.

The plaintiff in *Constance B.* alleged that visual obstructions and inadequate lighting at a roadside rest area constituted a dangerous condition that led to her being sexually assaulted there. The court characterized the claim as

resting on "the notion that the state provided an opportunity for misconduct by a third party." (*Constance B., supra,* 178 Cal.App.3d at p. 205.) As such it belonged to a class of cases " 'where a defendant is liable for providing or not removing the opportunity for another to do harm or for a natural event to cause it.' " (*Ibid.,* quoting Hart & Honoré, Causation in the Law (1959) p. 179.) In such cases, the court observed, " 'The "causal connexion [*sic*]" between a defendant's act and the harm may be succinctly described by saying that he has "occasioned" it.' " (*Ibid.*) A public entity may be liable under section 835, the court continued, for " '[o]ccasioning' harm by maintaining public property in a manner which increases the risk of a criminal assault." (*Constance B.,* at p. 205.) But far from requiring that the intervening third party conduct itself flow from the dangerous condition, the court went out of its way to acknowledge the potential for "concurrent causes, including third party intervention." (*Id.* at p. 208.) It then stated, "[T]he predicate for liability is a causal relation between *injuries of the kind which did occur* and the claimed dangerous condition." (*Ibid.,* italics added.) The court concluded that none of the physical characteristics cited by the plaintiff had actually contributed to her injuries. In particular, the assault could not be ascribed to inadequate lighting because, as the court in *Zelig* put it, "the plaintiff's assailant did not take advantage of the shadows but stood in the light." (*Zelig, supra,* 27 Cal.4th at p. 1136; see *Constance B., supra,* 178 Cal.App.3d at p. 211.)

The plaintiffs in *Moncur, supra,* 68 Cal.App.3d 118, sought to impose liability on a city for failing to adequately guard against the planting of a bomb in airport lockers. The trial court entered judgments on demurrer. After commenting at some length on the unpredictability of "deranged person[s]" and "fanatic[s]" and the threat to privacy rights posed by airport searches, the court affirmed the judgment in two paragraphs. (*Id.* at pp. 125, 126.) As relevant here, the court wrote that the complaints failed to allege facts "from which it could even be inferred that the condition of the terminal was the 'cause' of the explosion." (*Id.* at p. 126.) The court then declared, "This tragic event was solely the result of the criminal conduct of a third person unaided by any act or omission on the part of the City." (*Ibid.*) The case was described in *Zelig, supra,* 27 Cal.4th at page 1136, as resting on the plaintiff's failure to "allege facts from which it could be inferred that the physical condition of the airport terminal was the cause of the bombing."

Both of these cases are consistent with the general principles we described above, most particularly that the touchstones of proximate cause analysis are causation in fact and foreseeability of harm. They are best understood as emphasizing a need to establish, in a case of this kind, that the harm resulted from a *physical characteristic* of the property and not from some other act or omission by a public entity. Thus in *Constance B.* the plaintiff failed to establish causation in fact because the dangerous conditions she posited had

played no role in her being attacked. In *Moncur* the court found the facts alleged by the plaintiffs insufficient to link their injuries to any physical condition of the airport. It also bears noting that in both of those cases an essential force in bringing about the plaintiffs' harm was a deliberate act of violence by a third party. In such a case it may well be that unless the condition of the property somehow induced, facilitated, or "occasioned" the violent conduct, it could not be viewed as a cause of the plaintiff's injuries. But this hardly means that in every case of intervening third party conduct, whether deliberate or not, a public entity is excused from liability for a dangerous condition of its property unless the plaintiff shows that the dangerous condition caused the third party's conduct.

Several courts have quoted *Zelig*'s description of *Constance B.* and *Moncur* as if it were an independent rule of law, but we have found only one published case in which it actually formed a basis for a holding, and there it was one of several alternative holdings. In *City of San Diego v. Superior Court* (2006) 137 Cal.App.4th 21, 29 [40 Cal.Rptr.3d 26], the plaintiffs' decedent was struck by a vehicle that was engaged in unlawful street racing. The plaintiffs argued that the condition of the street was dangerous in that its configuration "was an invitation to street racing," and "poor lighting at the scene made it difficult for drivers [such as the plaintiffs' decedent] to see or gauge the closing speed of cars racing on the street." (*Id.* at p. 24.) The reviewing court issued a writ directing the trial court to grant the city's motion for summary judgment. The court first concluded that neither the configuration of the street nor the absence of lighting constituted a dangerous condition. (*Id.* at p. 31.) The court then offered three alternative rationales for its result. The first was that "it is not possible to say how much, if any, lighting is necessary to protect all drivers from speeding vehicles." (*Ibid.*) The second was that "[o]ne can postulate" situations in which "a prudent driver, even with significant lighting in place, still might not see oncoming cars or be able to gauge their speed." (*Ibid.*) Only after these observations did the court invoke the language from *Zelig*, writing, "[E]ven if we were to conclude a defective physical condition exists for failure to install lighting, there is no evidence the racers were influenced by the absence of street lights." (*City of San Diego v. Superior Court, supra*, at p. 31; see *id.* at p. 29.)

Other published decisions have quoted the subject language from *Zelig*, but in none of them did it appear to play any role in the outcome. In *Cerna v. City of Oakland* (2008) 161 Cal.App.4th 1340, 1360 [75 Cal.Rptr.3d 168], the only holding on the subject of causation was that a school district's failure to place a crossing guard at the crosswalk "was not a proximate cause of injuries suffered" because the plaintiffs knew there was no guard there and presented no evidence "that a crossing guard could have averted the accident." In *Sun v. City of Oakland, supra*, 166 Cal.App.4th 1177, 1187, the entire basis for the holding was that the evidence did not raise a triable issue

with respect to a dangerous condition of public property. Given that conclusion, the court declared, "we do not reach the causation issue raised by City." (*Id.* at p. 1193, fn. omitted.) Similarly, the decision in *Salas v. Department of Transportation* (2011) 198 Cal.App.4th 1058, 1070 [129 Cal.Rptr.3d 690], appears to rest entirely on the rationale that the plaintiffs were unable to establish a dangerous condition of public property.

■■■ We decline to follow *City of San Diego v. Superior Court, supra,* 137 Cal.App.4th 21, insofar as it adopts a new and extremely restrictive rule for determining when the conduct of a third party will operate as a superseding cause excusing a public entity from liability for a dangerous condition of its property. We do not believe the Supreme Court had any intention of adopting such a rule in *Zelig,* with the possible exception of situations where the plaintiff's injuries could not have occurred but for an intervening act of deliberate violence. The Supreme Court has since described *Zelig* as holding that "public liability lies under section 835 only when a feature of the public property has 'increased or intensified' the danger to users from third party conduct." (*Bonanno, supra,* 30 Cal.4th 139, 155.) We have little doubt that this test could be found to have been satisfied by the evidence in the present case. Indeed there is evidence here from which a trier of fact could conclude that the third party conduct—at least the immediately injurious conduct, which was the act of driving off the road—was "caused" by the characteristics plaintiff cites as dangerous conditions.

Town also suggests that plaintiff is unable to establish proximate cause because Rodriguez testified that he often drove on Blossom Hill Road and was "thoroughly familiar" with its features at the location in question. This testimony, if credited, may indeed prevent plaintiff from substantiating some factual hypotheses on which liability might otherwise be predicated. For example, if jurors believe that Rodriguez never drove in the right lane on the two-lane portion of Blossom Hill Road, plaintiff will have a hard time persuading them that his entry into the graveled area where plaintiff had parked was the result of an unsuccessful attempt to merge from the right-hand lane into the single-lane portion of the road. Similarly, if jurors believe that Rodriguez knew cars were frequently parked in the gravel area on the diagonal, it may be difficult to persuade them that he was surprised to find plaintiff parked there. So far as we can tell, however, plaintiff's case does not depend on the hypothesis that Rodriguez was surprised by the configuration of the road or left it due to a failure to negotiate the merger from two lanes to one. Plaintiff's basic theory is that the configuration of the road and the graveled area beside it induced Rodriguez to drive off the one while inducing plaintiff to park in the other. Insofar as Town's arguments do not address that theory, they cannot sustain the judgment under review.

Town also seems to be addressing cause in fact when it asserts that there is "no admissible evidence" that Rodriguez was "trying to pass stopped cars" when he hit plaintiff. Town cites Rodriguez's professed inability to recall any of the events leading up to plaintiff's injuries and asserts that plaintiff has no evidence to fill this gap. The record, however, contains evidence from which a jury could infer that Rodriguez was attempting to bypass stalled traffic when he drove into the area where he hit plaintiff.

First, contrary to Town's assertion, there was ample evidence that cars were stopped when Rodriguez "veered" off the road.[11] Carrie Cummings testified in deposition that "a few moments before the collision," she had stopped on Blossom Hill Road to turn left into her driveway. "[A]t that time," three to five cars "came to be waiting" behind her. These following cars were "just sitting there waiting," the most obvious meaning of which is that they had come to a complete stop. She then heard a squealing of tires from behind the following cars. She expected a rear-end collision. When that did not occur, she completed her left turn. After she came to a stop in her driveway, as she was opening her car door, she saw "dirt" in the rearview mirror. As her foot stepped onto the driveway, she heard Rodriguez's car hit plaintiff.

This testimony, if credited, virtually compels a finding that cars behind Cummings came to a stop at some point. Town cites Rodriguez's testimony that he "did not see any cars" in front of him before the collision, but this only contributes to a conflict in the evidence, including a conflict with his own testimony that he did not recall events preceding the collision. Town attempts to avoid this conflict by denying any evidentiary basis to suppose that cars were "*still* in the roadway when Rodriguez approached," because Cummings "had only observed the slowed [*sic*] vehicles '*prior*' to turning into her driveway." (First italics added.) But this argument overlooks the elementary principle that a fact can be proven by inference from circumstantial evidence, as well as by direct testimony. (*Ajaxo Inc. v. E\*Trade Group Inc.* (2005) 135 Cal.App.4th 21, 50–51 [37 Cal.Rptr.3d 221].) Town disregards this principle in critiquing the sufficiency of plaintiff's proofs, even though it repeatedly resorts to inferences—some highly doubtful—in its own favor. Thus it suggests that there must *not* have been any vehicles stopped in the road at the time of the collision because "[c]ommon sense dictates" that "at least one of the vehicles" so stopped "would have remained in place after observing or hearing the collision and Cole's screams." This is an argument for a jury, not a basis for summary judgment.

---

[11] Town uses a form of the word "veer" no fewer than 44 times in an apparent effort to suggest that Rodriguez's vehicle left the road in an uncontrolled or poorly controlled maneuver. This is at best an inference resting solely upon the fact of his intoxication.

Indeed this characterization applies more broadly to Town's arguments concerning the presence *vel non* of an obstruction before Rodriguez. To prevail on summary judgment, Town had to demonstrate that a jury *could not find* on the available evidence that the impediment that formed behind Cummings remained in place, or more precisely, had not fully cleared, when Rodriguez arrived at the scene. The evidence of record is subject to multiple interpretations on that question. Our own sense of the probabilities may not conform to Town's argument, but that is beside the point, for this is not a question for us—or the trial judge—to decide. It is a classic issue of fact, entrusted by our Constitution, in the absence of waiver, to the sovereign power of a jury. Town's assertion that there was "no admissible evidence" from which a trier of fact could find in favor of plaintiff is simply incorrect.

Town also questions plaintiff's ability to establish Rodriguez's "motive[]" for leaving the road, i.e., that he did so in order to bypass stopped or slowed cars, and thus as a result of the configuration of the road. At his deposition—apparently conducted in prison—Rodriguez professed an inability to account for his actions, saying that he remembered nothing from the time he left the gas station where he had been drinking until the time he felt the impact of his collision with plaintiff. He attributed the lack of memory to "the alcohol." These are apparently the "facts" on which Town relied when it asserted, in its reply papers, that "Rodriguez traveled off the eastbound lane because he passed out, fell asleep or was otherwise inattentive to his driving due to his intoxication." But this suggestion itself depends on a highly debatable surmise about the explanation for Rodriguez's professed lack of memory. The record suggests grounds on which a jury could view that profession with skepticism. Rodriguez testified that he had only consumed two polystyrene cups of an alcoholic beverage he twice described as "like wine." He had earlier told an officer that the beverage was Canadian whiskey, but this contradiction presented an issue of fact which the trial court was powerless to resolve. Whatever form the alcohol took, Rodriguez stated consistently that it had been diluted "half-and-half" with juice. A trier of fact would hardly be compelled to conclude that he had drunk enough to pass out, fall asleep, or black out.

A trier of fact could also find that Rodriguez's professed lack of memory was not consistent with the cognitive state he testified to having immediately after the collision. He testified that upon realizing what had happened he stopped briefly to consider his options: "[T]he only thing that came to my mind is to go—to leave right away and go and be with my wife because I thought they were going to give me a long time." By the last clause he meant "that [he] knew that the police would send [him] to jail for a long time." This was an astute judgment for a man supposedly too drunk to know whether he was on or off the road. It reflected a recognition both that he had previously been convicted of drunk driving, and that his recidivist status would probably

result in a lengthy incarceration. In anticipation of this outcome he elected to spend his last minutes of freedom with his wife. That intention was apparently thwarted by his being arrested while parking at his home. But the fact that he could form such a plan, for such a reason, suggests a level of postimpact ratiocination that a jury could find irreconcilable with the preimpact stupefaction posited by Town.

Finally, a jury might conclude that Rodriguez, who was represented by counsel, had a reason to testify less than candidly. To attribute his actions entirely to inebriation might have appeared consistent with his best interests because, having already pled guilty to driving under the influence, nothing he said on that subject was likely to do him any further harm. In contrast, he might compound his difficulties by admitting that he made a conscious decision to drive off the road, in violation of his own professed understanding that he "had to keep [his] car between the double yellow line and the white line."

Quite apart from the testimony of Rodriguez and the conflicting inferences that might be drawn from it, the trial court had before it the declaration of Carrie Cummings, in which she stated her "belief" that the accident occurred when "Lucio Rodriguez passed the few cars that had slowed behind me prior to my turn." She went on to state the basis for this opinion: "Though I was not witness to the accident, the only way I deem it feasible for Mr. Rodriquez to have struck Sara Cole was for him to have passed the slowed cars on their right. Given my observations of the location of Sara Cole's vehicle, and of the vehicles that had slowed prior to my turn, Mr. Rodriguez could not have struck Ms. Cole had he not pulled out and around the slowed cars in the manner I have described. Cars passing on the right in this section of Blossom Hill Road is a common occurrence."

■■■ Although Town filed 38 pages of objections, we find none directed to the averment just quoted. Nor is it obvious that an objection, if made, could properly have been sustained. A lay witness may give opinion testimony if it is "[r]ationally based on the perception of the witness" (Evid. Code, § 800, subd. (a)) and "[h]elpful to a clear understanding of his testimony" (*id.*, subd. (b)). Here the witness possessed special firsthand knowledge of the relevant times, distances, and locations as well as the prevailing driving customs at the site of the collision. Her belief that Rodriguez must have pulled out from behind her to pass other cars that had slowed during her turn supported an inference that the times and distances involved, of which she was a percipient witness, were consistent with this hypothesis.

In sum, the record supports two competing hypotheses, a choice between which could only be made by a trier of fact—not by a judge hearing a motion

for summary judgment. According to plaintiff, Rodriguez left the road for the same reason any other impatient driver might have done so under the circumstances: to bypass an obstruction in the road. Town suggests that Rodriguez may have just happened to "veer" off the road, in a drunken stupor, at the location where plaintiff was standing. It is emphatically a jury question whether the latter possibility, or any other consideration, prevents plaintiff from establishing the elements of her claim by a preponderance of the evidence. So far as this record shows, a jury could reasonably find a substantial causal relation between the dangerous condition posited by plaintiff and the injuries suffered by her.[12]

## IV. *Notice*

 Under section 835, plaintiff must establish that Town had "actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition."[13] (§ 835, subd. (b).) Government Code section 835.2 elaborates on this requirement.[14] Town asserts that, as a matter of law, it lacked the requisite notice.

---

[12] Also falling logically under the rubric of causation is Town's assertion that the manner in which plaintiff was parked placed her farther from the traffic lane on Blossom Hill Road than she would have been if the area had been configured in the usual manner for parallel parking. We find this discussion less than fully intelligible, but whatever its intent it seems to presume that Rodriguez would have driven off the road no matter how the area was configured. Once again Town is free to argue the point to a jury, but it furnishes no basis for summary judgment.

[13] A plaintiff unable to establish the requisite notice may still prevail by showing that the dangerous condition was "created" through "[a] negligent or wrongful act or omission of an employee of the public entity within the scope of his employment." (§ 835, subd. (a).) Plaintiff has at no time sought to bring herself within this alternative theory.

[14] Government Code section 835.2 provides: "(a) A public entity had actual notice of a dangerous condition within the meaning of subdivision (b) of Section 835 if it had actual knowledge of the existence of the condition and knew or should have known of its dangerous character.

"(b) A public entity had constructive notice of a dangerous condition within the meaning of subdivision (b) of Section 835 only if the plaintiff establishes that the condition had existed for such a period of time and was of such an obvious nature that the public entity, in the exercise of due care, should have discovered the condition and its dangerous character. On the issue of due care, admissible evidence includes but is not limited to evidence as to:

"(1) Whether the existence of the condition and its dangerous character would have been discovered by an inspection system that was reasonably adequate (considering the practicability and cost of inspection weighed against the likelihood and magnitude of the potential danger to which failure to inspect would give rise) to inform the public entity whether the property was safe for the use or uses for which the public entity used or intended others to use the public property and for uses that the public entity actually knew others were making of the public property or adjacent property.

"(2) Whether the public entity maintained and operated such an inspection system with due care and did not discover the condition."

Town acknowledges that it received a complaint to the effect that impatient eastbound drivers frequently drove off Blossom Hill Road to bypass traffic that had stopped or slowed while another driver executed a left turn. On July 1, 2004—more than three years before the accident here—Town traffic engineer Pu logged a "Traffic Service Request" from one of the residents along the north side of the road, who reported that "[w]hen she went eastbound on BHR waiting to make LT into [her] driveway, cars behind her honk, bypass on the right, tail gate, spinning tires. Said it was unsafe." She requested installation of a "[D]o [N]ot [P]ass" sign. Pu reported telling her that such a solution "won't resolve behavior issues. No bypassing on the right in a single lane direction is a driving rule that drivers should already know. We shouldn't install a sign for a particular driveway. Told her will check with PD the enforcement issue." This amply establishes that Town had been notified of the driving behavior in question, and had been apprised of the opinion of one percipient observer that it presented a safety hazard.

A trier of fact could also find that Town had actual notice of the frequent presence of pedestrians in the area through which these impatient drivers drove. The evidence supports a finding that parking in this area was so common that town officers must have known of it; that indeed, Town had configured the area to accommodate and implicitly encourage this use; and that several town employees or officials acknowledged being actually aware of it. Town traffic engineer Pu testified in his deposition that he himself had parked there, and that at times he had seen "many" cars parked there, though at others it appeared "not much" used. Interim city engineer and director of public works Kevin Rohani testified that he too had parked there. Former Traffic Sergeant Dave Gravel testified that he had parked there more than a dozen times. Former traffic coordinator Layne Davis recalled a complaint from a citizen on the south side of Blossom Hill Road that his driveway had been "blocked by somebody parking in the accident location."

The evidence would also support a finding that responsible Town officers knew that park visitors making such use of the area commonly parked on the diagonal. Pu testified that he knew cars parked there diagonally, and that "diagonal parking was permitted." He and Rohani both testified that they themselves had angle parked there, and did not consider their doing so to be illegal. Sergeant Gravel testified that he had parked there in both diagonal and parallel orientations and that no one would get a ticket for either unless they blocked a hydrant.

Town asserts that "[t]he absence of any prior accidents or injuries on the gravel shoulder is evidence of lack of notice." Assuming this to be true, at

most it establishes grounds for a finding in Town's favor, which is hardly enough to sustain a summary judgment. Nor is plaintiff required to prove that Town knew for a fact that accidents of this kind would occur. The test for actual notice was satisfied if Town had "actual knowledge of the existence of the condition and knew or should have known of its dangerous character." (Gov. Code, § 835.2, subd. (a).) The above proofs would certainly sustain a finding that Town had actual knowledge of the configurations, distances, and other physical characteristics of the road and roadside graveled area that often induced two groups of users to make disparate uses of the latter. A jury could also find that Town "knew or should have known" of the danger posed by these simultaneous uses. (*Ibid.*) Needless to say, if a jury could find these facts it could also find that Town had constructive notice, i.e., that the condition and its dangerousness were sufficiently obvious that Town, "in the exercise of due care, should have discovered" them. (Gov. Code, § 835.2, subd. (b).)

Although we do not believe the point is necessary to our decision, we also observe that there is some evidence of at least one prior accident due to the conflicting uses in question, knowledge of which was conveyed at least to police officers. Plaintiff's husband declared that in 2003, while he was present to coach a baseball game, "a collision took place in the gravel area near where [plaintiff] was injured. In the collision, a diagonally parked vehicle attempted to back out of the gravel area, and was rear-ended by a vehicle approaching on eastbound Blossom Hill Road. I heard the sound of the impact, and saw the police arrive thereafter." Knowledge of this occurrence is not rendered irrelevant by the possibility that the collision did not produce bodily injuries. "A particular type of accident may be reasonably anticipated even if such an accident had not occurred before. [Citations.]" (*Maupin v. Widling* (1987) 192 Cal.App.3d 568, 576 [237 Cal.Rptr. 521].)

After ineffectually denying the sufficiency of the evidence to establish the requisite notice, Town reverts yet again to its only real argument on appeal: "Regardless, there is no evidence that left turns or passing on the right was a factor in this accident. . . . There is no causal connection between Rodriguez's act and the condition of the property . . . ." We have already rejected this assertion.

## DISPOSITION

The judgment is reversed.

Premo, J., and Elia, J., concurred.

A petition for a rehearing was denied May 24, 2012, and respondents' petition for review by the Supreme Court was denied July 11, 2012, S202785. Cantil-Sakauye, C. J., did not participate therein. Kennard, J., was of the opinion that the petition should be granted.