Filed 2/17/15  Killings-Rodriguez v. City of Los Angeles CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| ANGELA KILLINGS-RODRIGUEZ, a Minor, etc., et al., | B248707 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC454711) |
| v. | |
| CITY OF LOS ANGELES, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Jan A. Pluim, Judge.  Reversed.

Law Offices of Gary A. Dordick and Gary A. Dordick for Plaintiffs and Appellants.

Michael N. Feuer, City Attorney, Amy Jo Field, Supervising City Attorney, and Lisa S. Berger, Deputy City Attorney, for Defendant and Respondent.

_____

Angela Killings-Rodriguez, a minor, by and through her guardian ad litem, Claudia Rodriguez; Claudia Rodriguez, individually and as successor-in-interest to Emely Aleman; and Jose Oscar Aleman, individually and as successor-in-interest to Emely Aleman (collectively, plaintiffs), appeal from the judgment entered after the trial court granted summary judgment in favor of the City of Los Angeles (City) in this action for dangerous condition of public property pursuant to Government Code section 835.[1] Plaintiffs contend that triable issues of material fact exist as to whether a dangerous condition of public property contributed to the cause of the automobile-pedestrian accident at an unsignaled intersection on Laurel Canyon Boulevard that killed Emely and rendered Angela a quadriplegic. We find the trial court erred in granting summary judgment because (1) triable issues of fact exist whether the subject intersection placed children at risk on a regular and continual basis as configured because the City failed to address the impact of nearby schools, retail shops, and the lack of gaps in traffic; (2) *Mixon v. Pacific Gas & Electric Co.* (2012) 207 Cal.App.4th 124 (*Mixon*) does not control this case because there is a confluence of City-caused factors that combine to make the intersection a dangerous condition; and (3) the third party conduct of the driver who hit the girls does not absolve the City of liability given the condition of the intersection. Accordingly, we reverse.

## BACKGROUND

On December 2, 2011, plaintiffs filed the operative second amended complaint against the City alleging a cause of action for dangerous condition of public property pursuant to section 835. According to the complaint, on November 2, 2010, about 7:20 p.m., Emely and Angela were crossing the street in a crosswalk at Laurel Canyon Boulevard and Archwood Street in Los Angeles when they were struck by a 1997 Jeep

---

[1] All further statutory references are to the Government Code unless otherwise indicated.

Wrangler driven by defendant Ian Leiner.[2]  The accident killed Emely and rendered Angela a quadriplegic.

At the time of the accident, Emely, then 10, and Angela, then 12, proceeded in a marked crosswalk to cross from the southeast corner of Laurel Canyon Boulevard at Archwood Street to the southwest corner.[3]  Laurel Canyon Boulevard, running north and south, had two lanes of traffic in each direction.  For southbound traffic, the pavement in each lane had an advance warning indicating "SLOW SCHOOL XING."  Two school crosswalk warning signs were at the crosswalk.  The crosswalk itself was marked in a ladder pattern.

As Emely and Angela proceeded in the crosswalk, three northbound motorists, two in the traffic lanes and one in the left-hand-turn lane, stopped for the girls.  A southbound motorist in the second traffic lane, the one closest to the parking lane, saw the crosswalk warning and also stopped for the girls.  As he was slowing his vehicle to a stop, the southbound motorist saw in his rearview mirror a Jeep, driven by Leiner, also proceeding southbound on Laurel Canyon Boulevard, but in the number one lane of traffic, closer to the center of the street.  Leiner did not slow down or use his brakes.  Leiner was familiar with the intersection and knew there was a crosswalk at the intersection.  On the evening in question, he had an unobstructed view of the intersection and crosswalk, and did not recall shadows over the crosswalk from trees, cars, buildings or any other object.  Leiner saw people on the corner, but did not think they were going to cross.  He was listening to a CD and did not like a particular song that had begun playing,

---

[2] Plaintiffs also named as defendants the Los Angeles Unified School District, the County of Los Angeles and Ian Leiner, the motorist who struck Emely and Angela.  None of those defendants is a party on this appeal.  Only Leiner remains a defendant in the action.

[3] The police report and the photograph exhibits of the intersection indicate the intersection only has one marked crosswalk, which is on the south side of the Archwood Street intersection.  The City's separate statement of facts states it is on the north side of the intersection, but the north side of the intersection did not contain a marked crosswalk.

and could not find the button to change the song and looked down to locate it. Leiner passed the southbound vehicle stopped at the intersection and hit Emely and Angela.

### 1. *The Operative Second Amended Complaint*

Plaintiffs alleged for their first cause of action against the City that the intersection constituted a dangerous condition of public property and the City knew that the intersection was dangerous and had a substantial history of previous incidents of pedestrians being struck and killed and a history of near hits/misses of pedestrians, but the City allowed and continued to allow said intersection to be in a state of disrepair by failing to provide adequate warnings and signs, failing to place any/sufficient traffic controls, failing to properly mark the subject crosswalk, failing to maintain trees and failing to provide adequate street lighting/illumination at the intersection for the pedestrians causing limitations on visibility.

### 2. *The City's Summary Judgment Motion and Opposition*

#### (a) **The City's Moving Papers**

The City moved for summary judgment arguing that as a matter of law its property was not in a dangerous condition so as to subject it to liability under section 835. The City argued that the intersection was not dangerous because it was properly illuminated, other drivers stopped for the girls, and Leiner stated that he did not see the girls but had looked down to change his CD. According to the City, summary judgment was proper under *Mixon*, *supra*, 207 Cal.App.4th 124, where no liability for a dangerous condition existed as a matter of law for a child who was struck and injured by a motorist while walking with his family in a marked crosswalk. The City submitted evidence in support of the motion that included portions of the accident report, police photographs taken approximately a week after the accident and excerpts of deposition testimony from Leiner and two other motorists who had stopped at the crosswalk for Emely and Angela.[4]

---

[4] The trial court erroneously overruled plaintiffs' objections to much of this evidence. Plaintiffs correctly argued the City's evidence lacked adequate foundation, lacked personal knowledge, lacked authenticity, and was based on inadmissible hearsay.

4

The City also submitted an expert declaration from a civil and traffic engineer David Royer.[5]  Royer stated that he had reviewed the traffic collision report wherein Leiner stated he had "clearly [seen] the crosswalk ahead and saw pedestrians standing on the corner[, but] admitted he was momentarily distracted" while changing the CD.  The traffic report indicated the driver in the lane next to Leiner, who stopped for the girls, could see the crosswalk from 300 feet away, and most of the witnesses said that the street lighting at the intersection was operational at the time of the accident.  Royer observed the accident scene twice at night around the same time as the accident and once during the day, and opined that "there were no physical obstructions [that] would reduce the visibility for approaching motorists seeing the pedestrian crossing or for pedestrians seeing the approaching vehicles."  For southbound traffic there was a warning stating, "SLOW SCHOOL XING."

### (b)     Plaintiffs' Opposition

Plaintiffs opposed summary judgment, asserting that triable issues of material fact existed as to whether the City's property was a dangerous condition that caused the accident.  Plaintiffs maintained that the City had created dangerous insufficient traffic gaps on Laurel Canyon Boulevard by installing and timing signal controls north and south of the intersection where the accident occurred, the danger of which was exacerbated by the painting of a crosswalk on only one side of the intersection as well as poor lighting conditions caused by overgrown trees.  In addition, according to plaintiffs, a prior accident history at the intersection, as well as the City's own studies performed in connection with the intersection, constituted evidence of a dangerous condition that had contributed to the accident.

Plaintiffs' expert, Ed Ruzak,[6] was the expert for California Department of Transportation in *Mixon*, *supra*, 207 Cal.App.4th 124.  According to Ruzak, "there are no

_____

[5] The trial court sustained plaintiffs' objections to Royer's supplemental declaration.

[6] The trial court sustained the City's objections to paragraphs 17, 25, 30, 31, 32, and 35 of Ruzak's declaration.  Plaintiff has not raised error with respect to the trial

significant similarities between the roadway involved in the *Mixon* accident and the intersection [that] is the subject of the instant matter . . . ." Ruzak opined that no significant accident history had existed in *Mixon* but one did in this case, thus demonstrating that the intersection at issue "constituted a dangerous condition of public property making it unsafe for pedestrians to safely cross on November 2, 2010, and going back at least to 2006."

According to Ruzak, there were no similarities between *Mixon*, *supra*, 207 Cal.App.4th 124 and the intersection of Archwood and Laurel Canyon Boulevard. Instead, the City created a dangerous condition that was a trap so that neither pedestrians or motorists were able to apprehend the presence of each other at the intersection. Ruzak based his opinion on numerous characteristics of the intersection, including insufficient traffic gaps, inadequate crosswalk markings at the intersection, lack of a signal, the presence of schools and retail businesses on opposite sides of the street, and a history of previous accidents.

Ruzak's declaration observed that the subject intersection "is located in an extremely [dense] residential area close to three different schools," two of which are elementary schools and one of which is a middle school. "[T]here is a high concentration of young school-aged children on the west side of Laurel Canyon. On the east side of Laurel Canyon there exist numerous commercial businesses frequented by school-aged children such as a 7-Eleven convenience store. According to the depositions, [Emely and Angela] were traveling back across Laurel Canyon from the 7-Eleven convenience store when the accident occurred."

Ruzak referred to an attached document showing that the City was aware of the large volume of traffic on Laurel Canyon Boulevard, which was designated a "'Major Highway,'" carrying 26,000 vehicles per day. Two years before the accident, the City's Traffic Engineer, Brian Gallagher, responding to public requests for a traffic signal at the

court's ruling. Our opinion, therefore, relies on those portions of Ruzak's declaration deemed admissible in the trial court.

6

intersection, wrote to superiors requesting the installation of a traffic signal at the subject intersection. Gallagher explained that the intersection met the City's criteria for installation of a traffic signal: "We now have a location where kids want to cross at a marked crosswalk, but there are no available gaps in traffic for kids to cross there. Are we able to get LAUSD to do a traffic signal here as mitigation or do I have to take out the crosswalk and prohibit pedestrians from crossing. . . . ? I don't want to have kids crossing a major highway where there are inadequate gaps, especially where they could cross at a signal a (long) block away in either direction." As an alternative to installing a signal, Gallagher recommended that the crosswalk be closed with a chain barrier and pedestrian crossing prohibited; this could be done at minimal cost and in a single day's work.

The City had been notified by Carmen Perez-Flores who lived at the intersection of Laurel Canyon and Archwood, as well as numerous other persons, of the significant accident history of the intersection. Perez-Flores had witnessed numerous injuries and accidents involving pedestrians at the intersection.

The City's own traffic engineer, Brian Gallagher, reviewed and endorsed a study conducted in 2008 in connection with the expansion of Bellingham Elementary School that recommended a traffic signal be installed at the intersection of Archwood and Laurel Canyon to ensure the safe and orderly movement of pedestrian and vehicular traffic. Gallagher himself found insufficient gaps in traffic to permit school-aged children to cross safely.

Ruzak noted the lack of traffic gaps at the intersection was created by the traffic signal timing at the signalized intersections to the north and south of Archwood and Laurel Canyon, at Vanowen and Kittridge. "Indeed, insufficient gaps in traffic is one of the most dangerous conditions for pedestrians because "pedestrians normally wait for a gap in traffic to cross, and over time, it is known to traffic engineers that pedestrians will become impatient and attempt to cross with smaller gaps than are safe. . . . [The subject intersection] require[d] pedestrians to 'weave and slalom' across the intersection in between moving cars."

7

The intersection of Archwood and Laurel Canyon had an accident history that included 35 accidents, including five separate pedestrian accidents and two bicycle accidents. An accident on January 30, 2009 involved two pedestrians who were hit by a northbound vehicle on Laurel Canyon as they proceeded west at the intersection of Archwood Street. There were at least 10 rear-end accidents because the intersection had "inadequate gaps in traffic patterns [so that] some drivers will stop for pedestrians standing on the curb, which is what occurred [in this case]. The high number of rear-end accidents reflects that cars are not observing the stopped automobiles in the roadway, which includes automobiles stopped for pedestrians attempting to cross Laurel Canyon."

Plaintiffs' expert Ruzak also maintained that the City's decision to paint a crosswalk on only the south side of the intersection rendered it a dangerous condition of public property. The failure to paint a crosswalk on both sides of the intersection "makes the existence of the crosswalk less visible." Further, there was no reason to permit the painting of a crosswalk on only one side of the intersection because there were also retail shops on the north side which would have benefitted from a crosswalk. Indeed, the City's own traffic study noted that the intersection's single crosswalk made the entrance of the crosswalk less visible and observed the crosswalk should have been placed on the north side of the intersection closer to the retail business and residential area.

In conclusion, Ruzak stated that "[w]hile it can always be argued in pedestrian versus auto accidents that the automotive driver was inattentive, and it was the driver's inattentiveness that caused the accident, it is well known in engineering and roadway safety that the design, construction and maintenance of intersections like Laurel Canyon and Archwood must take into account and guard against the inattentive driver as much as possible. Virtually every roadway accident involves an inattentive driver whether it be a case involving the need for a guard rail, center divider or some type of traffic control device. The obligation of [the City] is to know that drivers are sometimes inattentive and to design, construct and maintain the roadway with this known fact in mind." In this case, the City failed to take any action despite its knowledge that pedestrians were being hit by cars at this intersection. The intersection at issue created a trap configuration that

8

did not give enough warning to drivers or pedestrians of the presence of one another in time to avoid a collision.

### 3. *The Trial Court's Ruling*

Although our review is de novo, we observe that the trial court, in granting the motion for summary judgment, found that under *Mixon*, *supra*, 207 Cal.App.4th 124, there was no dangerous condition of public property. The trial court stated, "[t]he *Mixon* court held that a condition is not dangerous merely because of a failure to provide regulatory traffic control signals, and a public entity has no duty to provide street lights. [Citation.] There is no evidence that the physical condition of the roadway created a 'trap' for motorists and pedestrians. [Citations.] Five motorists saw the crosswalk. Four motorists actually stopped for the young girls. [Citation.]"

## DISCUSSION

## I. Standard of Review

A trial court must grant a summary judgment motion when no triable issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) We independently review the trial court's decision, "considering all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports. [Citation.] In the trial court, once a moving defendant has 'shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established,' the burden shifts to the plaintiff to show the existence of a triable issue; to meet that burden, the plaintiff 'may not rely upon the mere allegations or denials of its pleadings . . . but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action . . . .' [Citations.]" (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476–477.) The moving party must demonstrate that under no hypothesis is there a material issue of fact. (*WYDA Associates v. Merner* (1996) 42 Cal.App.4th 1702, 1709; *Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95, 106.) We review the trial court's ruling, not its rationale. (*Dammann v. Golden Gate Bridge, Highway and Transportation District* (2012) 212 Cal.App.4th 335, 340.)

9

Thus, to obtain summary judgment, the City was required to establish that plaintiffs would be unable to produce any evidence at trial that could support the conclusion by a reasonable person that a dangerous physical condition at the intersection could have contributed to an inattentive driver like Leiner hitting school-aged children in the crosswalk.

## II.     Triable Issues of Fact Exist Whether the Intersection Was a Dangerous Condition of Public Property

### A.     *Dangerous Conditions of Public Property*

Under section 835, a public entity may be liable if it creates an injury-producing dangerous condition on its property or if it fails to remedy a dangerous condition despite having notice and sufficient time to protect against it.  (*Grenier v. City of Irwindale* (1997) 57 Cal.App.4th 931, 939.)  Section 830 defines a "'[d]angerous condition'" as "a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used."  To constitute a dangerous condition, an injured plaintiff need not prove the public "'property was actually being used with due care at the time of the injury, either by himself or by a third party . . . .'"  (*Alexander v. State of California ex rel. Dept. of Transportation* (1984) 159 Cal.App.3d 890, 899.)  Indeed, "'the state gains no immunity from liability simply because, in a particular case, the dangerous condition of its property combines with a third party's negligent conduct to inflict injury.'"  (*Bonanno v. Central Contra Costa Transit Authority* (2003) 30 Cal.4th 139, 153, fn. 5.)

To recover in an action against a public entity under section 835, a plaintiff must prove:  "(1) a dangerous condition existed on the public property at the time of the injury; (2) the condition proximately caused the injury; (3) the condition created a reasonably foreseeable risk of the kind of injury sustained; and (4) the public entity had actual or constructive notice of the dangerous condition of the property in sufficient time to have taken measures to protect against it."  (*Brenner v. City of El Cajon* (2003) 113 Cal.App.4th 434, 439; § 835.)

The Law Revision Commission Comments that follow section 830 state that "Where it is reasonably foreseeable that persons to whom a lower standard of care is applicable—such as children—may be exposed to a substantial risk of injury from the property, the public entity should be required to take reasonable precautions to protect such persons from that risk. Thus, a public entity may be expected to fence a swimming pool or fence or lock up a dangerous instrumentality if it is reasonably foreseeable that small children may be injured if such precautions are not taken." (§ 830, Cal. Law Rev. Com. com., 32 West's Ann. Gov. Code (2012 ed.) foll. § 830, pp. 6-7); accord *Mathews v. City of Cerritos* (1992) 2 Cal.App.4th 1380, 1385.)

To establish causation, a plaintiff must prove that the defendant's conduct was a "'substantial factor' in bringing about his or her harm. [Citations.]" (*Bowman v. Wyatt* (2010) 186 Cal.App.4th 286, 312.) "That the location of a public improvement or, more broadly, its relationship to its surroundings, may create dangers to users is by no means a novel idea." (*Bonanno v. Central Contra Costa Transit Authority*, *supra*, 30 Cal.4th 139, 149; *Cole v. Town of Los Gatos* (2012) 205 Cal.App.4th 749, 750 (*Cole*).)

Further, third party negligence may create liability where the immediate cause of a plaintiff's injury is a third party's negligence if some physical characteristic of the property exposes its users to increased danger from third party negligence. "'[P]ublic liability lies under . . . section 835 only when a feature of the public property has "increased or intensified" the danger to users from third party conduct.' [Citation.]" (*Cerna v. City of Oakland* (2008) 161 Cal.App.4th 1340, 1348; see *Morris v. State of California* (1979) 89 Cal.App.3d 962, 966, fn. omitted ["a condition of public property is dangerous if it creates a substantial risk of harm when used with due care by the public generally, as distinguished from [a] particular person charged as a concurrent tortfeasor . . ."]; *Cole*, *supra*, 205 Cal.App.4th at p. 768 ["if the condition of its property creates a substantial risk of injury even when the property is used with due care, the state gains no immunity from liability simply because, in a particular case, the dangerous condition of its property combines with a third party's negligent conduct to inflict injury"].)

To result in public entity liability, the dangerous condition of public property must have "'some causal relationship to the third party conduct that injures the plaintiff.'" (*Mixon*, *supra*, 207 Cal.App.4th at p. 131.) However, the dangerous condition of public property need not constitute the sole reason for the accident. A public entity cannot establish an entitlement to summary judgment merely by showing that a third party's conduct was a cause of plaintiff's injuries; rather, it must establish as a matter of law that plaintiff would be unable to present evidence that any condition of the public property where the accident occurred was *also* a substantial causative factor in bringing about her or her injuries. (*Cole*, *supra*, 205 Cal.App.4th at p. 769.)

Under traditional tort principles, once a defendant's conduct is found to have been a cause in fact of the plaintiff's injuries, the conduct of a third party will not bar liability unless it operated as a superseding or supervening cause, so as to break the chain of legal causation between the defendant's conduct and the plaintiff's injuries. (See *Pedeferri v. Seidner Enterprises* (2013) 216 Cal.App.4th 359, 372.) The misconduct of a third party will not ordinarily have this effect if the misconduct itself was foreseeable to the defendant. (*Rosencrans v. Dover Images, Ltd.* (2011) 192 Cal.App.4th 1072, 1087.) Cases have held that the risk posed by intoxicated drivers to persons near a roadway may be foreseeable in itself, so as to present a question of fact for the jury. (See *Bloomberg v. Interinsurance Exchange* (1984) 162 Cal.App.3d 571, 576–577 [risk could be found foreseeable where stranded motorist was struck by intoxicated driver]; *Bigbee v. Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 58–59 [same, plaintiff struck while inside telephone booth adjacent to roadway].)

### B.     *Triable Issues of Fact Exist Whether the Conditions at the Intersection Constituted a Dangerous Condition of Public Property*

Plaintiffs contend that the trial court erred by granting summary judgment on the ground of no dangerous condition as a matter of law because triable issues of material fact exist based on the frequency of use by children, the presence of three schools, shopping centers that are frequented by the school children in this residential neighborhood, insufficient traffic gaps, combined with inadequate crosswalk painting at

the intersection, lack of traffic controls at this intersection when conditions require them, as well as a prior history of accidents and studies of the intersection.  We agree.

To support a finding of a dangerous condition of public property here, given the proximity of the crosswalk to the nearby schools and the retail business, the crosswalk into which Emely and Angela stepped had to present a serious risk of injury to those children using it with due care, including school children using it to cross between their schools and homes and the 7-Eleven and other stores adjacent to the intersection.  The level of "due care" the City had to expect of the children—the level of child behavior the City had to foresee—was a lower level of care than that expected of adults.

In *Mixon*, *supra*, 207 Cal.App.4th 124, a motorist struck a child who was walking with his father and siblings in a marked crosswalk.  The crosswalk had no signal lights and no streetlights.  The father had paused at the intersection and waited for traffic to stop before entering the crosswalk.  One northbound car stopped, but a southbound truck approached the crosswalk, failed to stop, and hit one of the children, severely injuring him.  (*Id.* at p. 129.)  *Mixon* concluded the intersection did not constitute a dangerous condition although it had poor lighting, no traffic signal, no pedestrian crossing warnings, parallel line crosswalk markings instead of more visible zebra stripe markings, and a dip in the grade of the intersection because none of those features, alone or in combination, created a substantial risk of injury when the intersection "is used by pedestrians and motorists with due care."  (*Id.* at p. 132.)

*Mixon* observed that a public entity had no duty to provide streetlights.  "[A] prior dangerous condition may require street lighting or other means to lessen the danger but the absence of street lighting is itself not a dangerous condition."  (*Mixon*, *supra*, 207 Cal.App.4th at p. 133.)  A public entity may be liable where a dangerous condition exists for reasons other than or in addition to the failure to provide controls or markings and, "[h]ere there are no additional features to combine with the lack of a traffic control signal to make the . . . intersection dangerous."  (*Id.* at p. 135.)  However, acknowledging that a combination of factors could create a dangerous condition, rather than finding such dangerous condition existed in the case before it because of the confluence of facts, the

13

*Mixon* court limited its analysis to the fact there had been no similar accidents at the intersection.  (*Id.* at p. 138.)

### 1.    THE PHYSICAL SETTING OF THE INTERSECTION—THE TRAFFIC GAPS, SCHOOLS, RETAIL SHOPS, AND PRESENCE OF CHILDREN—CONSTITUTED A DANGEROUS CONDITION

Here, even if the City had no obligation to put in traffic controls at this intersection, the intersection nonetheless constituted a dangerous condition of public property.  Assuming that the City's painted crosswalk and crosswalk sign were adequate, there were other salient characteristics of the intersection operating to transform it into a dangerous condition.  These features included the traffic gaps created by the signalized intersections to the north and south of Archwood Street on Laurel Canyon, the children frequenting the area from the three local schools, and the retail shops drawing those children across the expanse of Laurel Canyon.

It is a logical fallacy to conclude that because *Mixon* found no liability where the public entity had not provided any safety measures, then no entity could have liability where it has provided some safety measures.  The point is, as plaintiffs argue, that a public entity can create a dangerous condition where in theory no affirmative act (such as crosswalk markings, signals, warning signs) may have been required, yet those affirmative acts may act together to diminish safety conditions substantially and thus create liability for a public entity.  *Mixon*, *supra*, 207 Cal.App.4th 124 does not preclude this conclusion because, as noted, its holding is not based on the lack of confluence of conditions, but on the fact there had been no accidents at the intersection, and *Mixon* thus concluded that ergo, the intersection was safe.  Further, as the *Mixon* court recognized, a public entity cannot rely on safety measures already in existence when the public entity is aware of a dangerous condition that nonetheless, in spite of the safety conditions, exists on its roads.  (*Id.* at p. 135.)  Here, the record shows that there had been 35 accidents, including five pedestrian accidents, at this intersection.  Thus, *Mixon* is inapposite our analysis here.

14

The crosswalk into which Emely and Angela last stepped presented a serious risk of injury to school children like them, using it with due care to cross between their schools and homes and the 7-Eleven and other stores adjacent to the intersection. The level of "due care" the City had to expect of the children—the level of child behavior the City had to foresee—was a lower level of care than that expected of adults. Also, the City had to foresee that children, and even adults, would cross at times when the inevitable inattentive or speeding driver was drifting or barreling by. Indeed, this is exactly what happened the night of the accident, when Emely and Angela proceeded in the crosswalk from the east side of Laurel Canyon, with its retail shops, to the west side of the street and were hit by Leiner. Another very similar accident occurred approximately eight months before when two pedestrians were hit in the same crosswalk by a northbound car.

This environment—the presence of the schools, retail shops, and high volume of traffic—required the City to do more than paint a crosswalk and put up crosswalk signs. Thus, for example, although warning signs preceded the crosswalk in the direction Leiner was traveling, and the crosswalk was indicated by signage and such conditions might preclude liability, there were also other factors at work here to create a dangerous condition: Plaintiffs' expert established that (1) traffic gaps on the busy boulevard were infrequent due the City's signal control at the signalized intersections to the north and south of Archwood Street, and (2) children were drawn to the retail stores across the street from the school. Moreover, it may be inferred from Ruzak's testimony about the lack of gaps that the long distance between the traffic signals to the north and south of Archwood Street and the crosswalk gives faster drivers a chance to build up speed and pull ahead of slower drivers, thus creating a strung-out line of traffic without gaps. The phenomenon is observable in highway driving, where drivers frequently become more "strung out" as the distance they have gone increases. Conversely, if all drivers start from a dead stop at a traffic signal and have only a short distance to go before they reach another traffic light, the faster drivers will not have as much opportunity string themselves out ahead of the slower drivers. This shorter distance, in turn would

15

significantly diminish the gap between the fast drivers and the slower drivers in reaching the crosswalk. Indeed, the City's own engineer recognized that "there are no available gaps in traffic for kids to cross. . . . I don't want to have kids crossing a major highway where there are inadequate gaps." Indeed, as Ruzak observed, "insufficient gaps in traffic is one of the most dangerous conditions for pedestrians because "pedestrians normally wait for a gap in traffic to cross, and over time, it is known to traffic engineers that pedestrians will become impatient and attempt to cross with smaller gaps than are safe. . . . [The subject intersection] require[d] pedestrians to 'weave and slalom' across the intersection in between moving cars."

## 2. THE INTERSECTION'S FEATURES ADDED UP TO A DANGEROUS CONDITION

Further, factoring in the steps the City did take, the City's actions were insufficient to address the dangerous condition of the intersection; indeed, the City's actions actually increased the dangerousness of the intersection by painting in a crosswalk that signaled to children that it was a safe place to cross when it was not a safe place—as recognized by the City's own traffic engineer. Further, considering all of the characteristics of the intersection together, rather in isolation, demonstrates *Mixon* does not control this case.

First, the City created the inadequate gaps in traffic by signalizing the two intersections to the north and south of Archwood. Laurel Canyon is a multi-lane, heavily traveled roadway that, as the City's engineer recognized, is akin to a "major highway." These inadequate gaps prompted children, and others, to attempt to cross the road when cars were approaching the crosswalk, expecting the cars would lawfully yield to them, rather than waiting until no cars were near. Further, the City put in *one* crosswalk on the south side of the street, compelling children to believe that it was safe to cross the street. The City engineer observed that the children wanted to cross at this crosswalk, but that "there are no available gaps in traffic for kids to cross there" in the first instance. A crosswalk existed, but there was no safe time to use it. This sole crosswalk also induced drivers heading southbound to be inattentive to its existence because no corresponding crosswalk existed on the north side of Laurel Canyon.

16

Further, all of the factors here—traffic gaps, heavy traffic, schools, children, beguiling shops across the street, a single crosswalk, no signal—added up to an unsafe crosswalk. The case before us is more like *Cole*, *supra*, 205 Cal.App.4th 749, where a combination of factors added up to a dangerous condition. There, the town had notice of the fact motorists frequently left the roadway to pass on the right left-turning cars and in so doing entered a gravel parking area used by persons using an adjacent park. (*Id.* at pp. 754–755.) The plaintiffs' expert opined that a combination of factors created a dangerous condition: physical characteristics of the roadway, traffic volume and speed, lane and shoulder widths, and the parking angle of users of the park. Such features "'made just this type of collision more than simply foreseeable—it made such a collision likely.'" (*Id.* at p. 761.) *Cole* rejected the argument that the conduct of a third party, the intoxicated driver who caused the accident, constituted a superseding or supervening cause because if such negligent conduct is foreseeable, then liability can attach. (*Id.* at p. 770.)

This district's opinion in *Swaner v. City of Santa Monica* (1984) 150 Cal.App.3d 789, and a number of cases discussed therein, are closely on point as well. In *Swaner*, plaintiffs were lying on the beach near a public parking lot when a vehicle illegally drove onto the beach and injured them. (*Id.* at pp. 795–796.) Plaintiffs argued that the public entity's failure to erect a barrier between the parking lot and the beach created a dangerous condition of public property. (*Id.* at p. 796.) Using an analysis similar to that in *Cole*, the court held that the fact that the driver was breaking the law and not using due care did not prevent a finding of a dangerous condition of public property, in part because the driver's illegal and careless act was foreseeable to the public entity. (*Id.* at p. 804; accord, *Mathews v. State of California ex rel. Department of Transportation* (1978) 82 Cal. App.3d 116, 122 [traffic signal stuck so one side was constantly red and one constantly green was dangerous condition of public property even though plaintiff's injuries resulted from driver illegally proceeding without due care through red light, as it was foreseeable a driver might do so]); *Slapin v. Los Angeles International Airport* (1976) 65 Cal.App.3d 484, 488–489 [lack of lighting in parking lot was dangerous

condition of public property when plaintiff was criminally assaulted in parking lot and criminal assault was foreseeable].)

While each of the salient features of the intersection here might not, without more, constitute a dangerous condition, reasonable minds could disagree whether the congruence of conditions at the intersection—lack of traffic gaps, multiple lanes of heavy traffic in either direction, an unsignaled crosswalk, and the presence of schools on one side of the intersection and retail shops on the other—together constituted a dangerous condition, thus creating a triable issue of fact. (*Mixon*, *supra*, 207 Cal.App.4th at p. 137 ["a dangerous condition of public property may be based on a combination of factors"].) Considering each factor in isolation led the trial court to apply disconnected rules of law pertaining to the marking of crosswalks and the conduct of third party motorists and overlook the panorama of conditions present. Thus, although if the relevant physical factors of the intersection considered alone may not constitute a dangerous condition, when considered in conjunction, they operate synergistically to create a hazard.

### 3. LEINER'S NEGLIGENT THIRD-PARTY CONDUCT DOES NOT, AS A MATTER OF LAW, ABSOLVE THE CITY

Finally, the trial court placed undue emphasis on the fact the other cars traveling in Leiner's direction stopped for the girls. Leiner himself saw persons on the corner at the crosswalk but did not believe they were about to cross the street; indeed, he might have concluded given the lack of a crosswalk signal and the volume of traffic on the roadway that the girls were waiting for a gap in the traffic and that the cars near him had stopped because of traffic in their lanes, not because of pedestrians. Arguably, if there had been a cross light at the intersection, Leiner would not have made such an assumption and perhaps would not have looked down at his CD player. The configuration of the intersection did not take into account the likely negligence of drivers who were inattentive on a busy street with fast-moving cars and who would erroneously assume children would not attempt to cross an unsignaled crosswalk when cars were coming. The isolated conduct of four motorists is not a basis to inductively conclude that no dangerous condition exists. Consider, for example, four motorists who stop at an

18

unmarked train track and one motorist who does not and is hit by a train. It would probably not be argued that because the fact that four cars did not make the mistake of the fifth, there is no dangerous condition. To engage in a counting game of how many vehicles avoid a potentially dangerous condition as a determinant of whether any dangerous condition exists is a logical fallacy. The import would be that there can only be a dangerous condition where the majority of cars succumb to the condition. That state of affairs would not be tolerable. In other words, just because some motorists avoid a hazard does not mean it does not exist.

The fact that some drivers would be attentive, or would drive slowly and carefully enough to stop at the crosswalk for the children, would not immunize the City from a finding there was a dangerous condition of public property presented by the numerous inattentive drivers reasonably expected to be speeding along such a major artery. The City was obliged to create and maintain the intersection with this foreseeable risk in mind.

Any finding that Leiner's inattentiveness caused the accident is a factual finding that Leiner was one hundred percent responsible and the condition of the property did not contribute at all to its occurrence. Moreover, it constitutes a factual finding that Leiner's conduct "operated as a superseding or supervening cause, so as to break the chain of legal causation between the City's conduct and plaintiffs' injuries." (*Cole*, *supra*, 205 Cal.App.4th at pp. 769–770.) It is well-established that the misconduct of a third-party driver like Leiner, or even one who is criminally under the influence of alcohol, "will not ordinarily have this effect if the misconduct itself was foreseeable to the defendant. As is noted above, courts have held that the risk posed, even by intoxicated drivers to persons near a roadway may be foreseeable in itself, so as to present a question of fact for the jury. (*Ibid*.)

Leiner's familiarity with the intersection in general based upon his past trips through the intersection is not relevant to whether the accident was solely caused by his inattention, rather than by the configuration, location and surroundings of the intersection. Instead, his split second of inattention highlights the fact that even being

19

familiar with the intersection, he was unable to apprehend the presence of pedestrians in front of him at the time of the accident due to the dangerous condition of the intersection. In short, his familiarity with the intersection does not mean it was not a dangerous condition as a matter of law. Further, Leiner's failure to stop due to inattentiveness likely would not have occurred, according to Ruzak, if the City had installed a traffic light or stop signs to address the lack of gaps created by the distant traffic lights. Indeed, the accident itself would not have occurred if the City had at least listened to its own Traffic Engineer and had erected a barrier to preclude unsafe crossing.

Finally, there is no evidence the girls themselves were not exercising due care when using the crosswalk. Section 830.8 codifies the principle that the governmental entity need not provide signage, but the Law Revision Commission notes make clear that although section 830.8 "prevents the imposition of liability based on the failure to provide traffic regulatory or warning signals or devices of a type not listed in Section 830.4, . . . liability may exist for failure to provide such a signal or device where the condition constitutes a trap to a person using the street or highway with due care." (4 Cal. Law Rev. Com. Rep. (1963) 801.)

In light of this authority, nothing stated in *Mixon*, *supra*, 207 Cal.App.4th 124 should be read to suggest contrary to the foregoing precedent that no dangerous condition of public property can be found when a third party's foreseeable lack of due care causes injury.

## CONCLUSION

To justify affirming the trial court's ruling on defendant's motion for summary judgment, this court would have to conclude that reasonable minds can come only to the conclusion that that plaintiffs will be unable to establish at trial that there existed a dangerous condition of public property that would have been expected to contribute, even in small measure, to an accident of this type. We find that triable issues of fact exist here.

Therefore we reverse.

20

**DISPOSITION**

The judgment is reversed.  Plaintiffs are entitled to recover their costs on appeal.

NOT TO BE PUBLISHED.


                                    JOHNSON, J.


I concur:


        MILLER, J.[*]


---

[*] Judge of the Los Angeles Superior Court, Assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Rothschild, P. J., dissenting:

Two girls were walking across the street in a crosswalk at an intersection on Laurel Canyon Boulevard at 7:20 p.m. on November 2, 2010. Four cars stopped to let them cross. The driver of a fifth car saw the girls standing on the corner of the intersection but failed to stop for them in the crosswalk, killing one girl and rendering the other a paraplegic. Of course, the driver was liable, but the question here is whether any evidence exists that the City might also be liable. I agree with the trial court that the plaintiffs did not raise a triable issue of material fact on the question of the City's statutory liability. The court properly granted summary judgment for the City, and I therefore respectfully dissent from the majority opinion.

The majority concludes that summary judgment was improper because of triable issues of material fact as to whether a dangerous condition of public property existed at the time of the tragic automobile-pedestrian accident. I believe that, based on the statutory scheme limiting liability for a dangerous condition of public property, the well-established case law interpreting the statutes, and the undisputed facts presented on summary judgment, no dangerous condition of public property existed as a matter of law.

Several important legal principles govern this case. First, public entity liability for an act or omission is governed exclusively by statute. (Gov. Code, § 815, subd. (a).)[1] Section 835 is the sole statutory basis for imposing liability on a public entity for the condition of its property. (*Cerna v. City of Oakland* (2008) 161 Cal.App.4th 1340, 1347 (*Cerna*).) Under that provision, "a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and either: [¶] (a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or [¶] (b) The public entity had actual or constructive

---

[1] Statutory references are to the Government Code.

notice of the dangerous condition . . . a sufficient time prior to the injury to have taken measures to protect against the dangerous condition."

Second, section 830, subdivision (a), limits a "'[d]angerous condition'" to "a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used." "A plaintiff's allegations, and ultimately the evidence, must establish a *physical* deficiency in the property itself. [Citations.] A dangerous condition exists when public property 'is physically damaged, deteriorated, or defective in such a way as to foreseeably endanger those using the property itself,' or possesses physical characteristics in its design, location, features or relationship to its surroundings that endanger users. [Citation.]" (*Cerna*, *supra*, 161 Cal.App.4th at pp. 1347-1348.)

Third, with respect to third party negligence, "'[p]ublic liability lies under . . . section 835 only when a feature of the public property has "increased or intensified" the danger to users from third party conduct.' [Citation]." (*Cerna*, *supra*, 161 Cal.App.4th at p. 1348.) Consequently, "[a] public entity may be liable for a dangerous condition of public property even where the immediate cause of a plaintiff's injury is a third party's negligence if some physical characteristic of the property exposes its users to increased danger from third party negligence. [Citation.] 'But it is insufficient to show only harmful third party conduct, like the conduct of a motorist. "'[T]hird party conduct, by itself, unrelated to the condition of the property, does not constitute a "dangerous condition" for which a public entity may be held liable.'" [Citation.] There must be a defect in the physical condition of the property and that defect must have some causal relationship to the third party conduct that injures the plaintiff. [Citation.]' [Citation.]" (*Salas v. Department of Transportation* (2011) 198 Cal.App.4th 1058, 1069-1070 (*Salas*).) "With respect to public streets, courts have observed 'any property can be dangerous if used in a sufficiently improper manner. For this reason, a public entity is only required to provide roads that are safe for reasonably foreseeable careful use. [Citation.] "If [] it can be shown that the property is safe when used with due care and

2

that a risk of harm is created only when foreseeable users fail to exercise due care, then such property is not 'dangerous'"'"" under the statutory definition. (*Sun v. City of Oakland* (2008) 166 Cal.App.4th 1177, 1183 (*Sun*).)

Finally, "[t]he existence of a dangerous condition is ordinarily a question of fact but 'can be decided as a matter of law if reasonable minds can come to only one conclusion.' [Citation.]" (*Cerna*, *supra*, 161 Cal.App.4th at p. 1347.) Thus, under section 830.2, "[a] condition is not . . . dangerous . . . if the trial or appellate court, viewing the evidence most favorably to the plaintiff, determines as a matter of law that the risk created by the condition was of such a minor, trivial or insignificant nature in view of the surrounding circumstances that no reasonable person would conclude that the condition created a substantial risk of injury when such property or adjacent property was used with due care in a manner in which it was reasonably foreseeable that it would be used." This provision, "while '[t]echnically . . . unnecessary,'" "'emphasize[s] that the courts are required to determine that there is evidence from which a reasonable person could conclude that a substantial, as opposed to a possible, risk is involved before they may permit the jury to find that a condition is dangerous.' [Citation.]" (*Salas*, *supra*, 198 Cal.App.4th at p. 1069, fn. 4.)

Application of these four legal principals to the undisputed facts on summary judgment demonstrates as a matter of law no dangerous condition of public property at the time of the accident. Considering only the evidence on summary judgment to which plaintiffs did not object, the undisputed facts show that, on November 2, 2010, at approximately 7:20 p.m., Emely, then 10, and Angela, then 12, proceeded in a marked crosswalk to cross from the southeast corner of Laurel Canyon Boulevard at Archwood Street to the southwest corner. Laurel Canyon Boulevard, running north and south, had two lanes of traffic as well as a left turn lane in each direction. For southbound traffic, the pavement in each through lane had an advance warning indicating "SLOW SCHOOL XING." Two school crosswalk warning signs were at the crosswalk. The crosswalk itself was marked in a ladder pattern, with clearly visible lines in good repair. On the night of the accident, the intersection was illuminated with four

3

intersectional street lights, one of which was directly over the crosswalk. Three corners at the intersection had shopping centers with illuminated parking lots.

As Emely and Angela proceeded in the crosswalk, three northbound motorists, two in the traffic lanes and one in the left-hand-turn lane, stopped for the girls. A southbound motorist in the second traffic lane, the one closest to the parking lane, saw the crosswalk warning and also stopped for the girls. As he was slowing his vehicle to a stop, the southbound motorist saw in his rearview mirror a Jeep, also proceeding southbound on Laurel Canyon Boulevard, but in the number one lane of traffic, closer to the center of the street. The motorist in the Jeep, which was Leiner, did not slow down or use his breaks. Leiner was familiar with the intersection and knew there was a crosswalk at the intersection. While driving, he had an unobstructed view of the intersection and crosswalk. He did not recall shadows over the crosswalk from trees, cars, buildings or any other object. He saw the crosswalk and people on the corner. He was listening to a CD and looked down to locate the button to change the song. Leiner passed the southbound vehicle stopping at the intersection and hit Emely and Angela. As a result of the accident, Emely died and Angela was rendered a quadriplegic.

These undisputed facts demonstrate as a matter of law no dangerous condition of public property at the time of the accident. Warning signs preceded the crosswalk in the direction Leiner was traveling, and the crosswalk was indicated by signage, marked and illuminated. Four motorists stopped for the girls to cross the street. Leiner, with an unobstructed view, saw the crosswalk and checked for pedestrians, noticing people standing on the corner. None of the cars that had stopped constituted an impediment to his seeing the girls in the crosswalk and stopping for them. The accident occurred because Leiner looked down to change a track on his CD, not because of any physical defect in the condition of the intersection. Given a motorist traveling in the same direction as Leiner stopped at the crosswalk, "a reasonably careful motorist would have had no difficulty seeing [the] pedestrian[s] (or in seeing a car that was stopped for [the] pedestrian[s]) and stopping, which further supports the conclusion that the configuration of the subject crosswalk did not create a substantial risk of injury when used with due

4

care." (*Sun*, *supra*, 166 Cal.App.4th at p. 1190 [summary judgment for city based on no dangerous condition when evidence that another driver stopped for pedestrian supported conclusion that pedestrians crossing at intersection were visible from a block away and no physical impediments associated with the intersection would prevent a driver from seeing and stopping for pedestrians].)  Because the intersection was "safe for reasonably foreseeable careful use," and a risk of harm was created only when Leiner failed to exercise due care, the statutes preclude liability for a dangerous condition of public property.  (*Id*. at p. 1183.)

To reach a contrary conclusion, the majority agrees with plaintiffs, based on their expert's declaration, that "triable issues of material fact exist based on the frequency of use by children, the presence of three schools, shopping centers that are frequented by the school children in this residential neighborhood, insufficient traffic gaps, combined with inadequate crosswalk painting at the intersection, lack of traffic controls at this intersection when conditions require them, as well as a prior history of accidents and studies of the intersection." (Maj. opn., at pp. 12-13.)  The majority is correct that "a dangerous condition of public property may be based on a combination of factors." (*Mixon v. Pacific Gas & Electric Co.* (2012) 207 Cal.App.4th 124, 137 (*Mixon*).)  Nevertheless, the factors themselves must be analyzed individually to determine whether they have validity under the circumstances of a particular case so that combined they create a triable issue as to a dangerous condition of public property.  (*Antenor v. City of Los Angeles* (1985) 174 Cal.App.3d 477, 484 ["if each of the [physical factors identified by plaintiffs] has a zero danger factor, it cannot be said that any alchemist's process will create one for the whole"].)  Here, an analysis of the factors identified by plaintiffs' expert, individually or in combination, establishes summary judgment was proper.

Initially, the majority identifies that a crosswalk was painted on only the south side of the intersection to support a triable issue of material fact on dangerousness. That reliance is faulty because the crosswalk painting on only the south side of the intersection, where the girls were crossing, although mentioned by plaintiffs' expert, undisputedly did not contribute to the accident.  An expert must account for the

5

undisputed facts and cannot create a triable issue on summary judgment based on opinion contrary to those facts. (*Miranda v. Bomel Construction Co., Inc.* (2010) 187 Cal.App.4th 1326, 1337 [opinion rejected on summary judgment because expert failed to account for undisputed facts]; *McKray v. State of California* (1977) 74 Cal.App.3d 59, 63 [expert could not defeat summary judgment based on opinion contrary to undisputed fact].) Here, as noted by the majority, plaintiffs' expert said that the failure to paint a crosswalk on both the north and south sides of the intersection "makes the existence of the crosswalk less visible." Under the undisputed facts, however, Leiner did not need more of an indication that there was a crosswalk on the south side of the intersection. He was familiar with the intersection, knew there was a crosswalk and before the accident saw it along with the girls on the corner. Thus, the lack of a painted crosswalk on the north side of the intersection under the undisputed facts cannot support the defeat of summary judgment.[2]

The majority relies heavily on plaintiffs' expert's opinion of lack of traffic gaps to support its reversal of summary judgment. I disagree. Failure to create traffic gaps does not constitute "a *physical* deficiency in the property itself." (*Cerna*, *supra*, 161 Cal.App.4th at p. 1347.) It is well established that "volume and speed of vehicular traffic in combination with heavy pedestrian use" do not constitute a dangerous condition; a physical defect must create a substantial risk of injury. (*Sun*, *supra*, 166 Cal.App.4th at p. 1189; see also *Brenner v. City of El Cajon* (2003) 113 Cal.App.4th 434, 440 (*Brenner*) ["volume and speed of vehicular traffic . . . would not permit a finding of a dangerous condition, at least in the absence of some additional allegation that the physical characteristics [where the accident occurred] created a substantial risk that a driver using due care while traveling along [the street] would be unable to stop for pedestrians who were using due care while crossing at the . . . intersection"].) In my

---

[2]    In fact, "'[a]ccording to the . . . [V]ehicle [C]ode, there is a legal crosswalk at every intersection whether it is marked or not.'" (*Sun*, *supra*, 166 Cal.App.4th at p. 1191.)

view, citing lack of traffic gaps is analogous to relying on volume and speed of traffic without more to claim a dangerous condition.[3]

Assuming a lack of traffic gaps could constitute a physical deficiency in the property, the majority's reliance on plaintiffs' expert's opinion in this regard still is misplaced. Although a third party's negligence does not negate liability for a dangerous condition of public property, the alleged defect in the property "'must have some casual relationship to the third party conduct that injures the plaintiff[s].'" (*Salas*, *supra*, 198 Cal.App.4th at p. 1070.) Plaintiffs did not establish that a lack of traffic gaps had any causal relationship to the third party conduct that resulted in injury. No evidence suggested that Leiner's failure to stop for the girls was caused by a lack of traffic gaps, or that "longer" traffic gaps would have led to a different result. In other words, no causal relationship existed between an alleged defect in the property—the lack of traffic gaps—and the third party conduct that injured the girls—Leiner's striking the girls after looking down despite seeing the crosswalk and people on the corner. (*Id*. at pp. 1069-1070 [no statutory dangerous condition of public property unless defect in the physical condition of the property has some causal relationship to the third party conduct that injures the plaintiff].)

According to plaintiffs, and accepted by the majority, the fact that four motorists stopped for the girls to cross the street is evidence of a dangerous condition of public property. Or, put a different way, no motorist should ever have to stop for a pedestrian at a crosswalk because traffic gaps should allow all persons to cross without any motorist stopping. The purpose of a crosswalk, however, is for motorists to stop for pedestrians.

---

[3]     To the extent the majority suggests that the physical defect in the property includes a consideration of the placement of the traffic lights to the north and south of the intersection, each 660 feet away, I disagree. Nothing about those lights suggested that a driver using due care would be unable to stop for pedestrians. In fact, the evidence was to the contrary because four drivers using due care did stop for the girls. Thus, the traffic lights to the north and south of the intersection did not "create[] a substantial risk that a driver using due care while traveling along [the street] would be unable to stop for pedestrians who were using due care while crossing at the . . . intersection." (*Brenner*, *supra*, 113 Cal.App.4th at p. 440.)

The purpose of a crosswalk is not to allow pedestrians to cross without any motorist needing to stop for them. Motorists will sometimes have to stop for pedestrians in a crosswalk no matter the length of the traffic gaps because a pedestrian, whether an adult or child, could always step off the curb near the end of the gap. Improved timing patterns therefore cannot eliminate the possibility that pedestrians will be in the crosswalk as cars approach, a point essentially conceded by plaintiffs because, as noted, their expert did not even suggest that "longer" traffic gaps would have made it unnecessary for motorists to stop in this case.

In conjunction with the lack of traffic gaps theory, plaintiffs' expert opined that the City could have undertaken several alternatives to make the intersection safer for pedestrians, such as installing a traffic light, a four-way stop or flashing lights. And the majority suggests that the City's failure to install a traffic light at the intersection, or undertake some additional measure, given the nearby schools and retail shops on the other side of the street, is evidence of a dangerous condition. Indeed, the majority concludes that "[t]his environment—the presence of the schools, retail shops, and high volume of traffic—required the City to do more than paint a crosswalk and put up crosswalk signs." (Maj. opn., at p. 15.) But the potential to increase public safety does not prove the condition of public property at the time of an accident was dangerous. (*Fredette v. City of Long Beach* (1986) 187 Cal.App.3d 122, 132 (*Fredette*); *Dole Citrus v. State of California* (1997) 60 Cal.App.4th 486, 494 (*Dole Citrus*) [potential that public property in its original design could have been made safer is irrelevant; "'liability is not to be fastened upon a municipality merely because it may appear that certain property, in nowise dangerous either in its construction or intended use, could possibly be made safer by other means'"].)

Moreover, the schools and shops near the intersection could not create a dangerous condition of public property absent an allegation of a physical condition that made it unsafe to cross. (*Brenner*, *supra*, 113 Cal.App.4th at p. 441.) No such allegation exists here. The "environment" cited by the majority (maj. opn., at p. 15), which purportedly increased pedestrian use of the crosswalk, particularly by children, did not create a

8

dangerous condition as a matter of law. For example, in *Cerna*, *supra*, 161 Cal.App.4th 1340, a motorist killed a child and injured members of her family as they crossed a city street on their way to school. (*Id*. at p. 1344.) Plaintiffs alleged a dangerous condition at the intersection based on the city's alleged failure to assure safe school access. (*Ibid*.) After reviewing each of the factors plaintiffs identified as potentially dangerous, the appellate court affirmed summary judgment, concluding that the factors, individually or in combination, did not create a dangerous condition. (*Id*. at p. 1352.) In *Brenner*, the appellate court held the sustaining of a demurrer to plaintiff's complaint was proper in part because the factor cited by the plaintiff "that there is a park, a convenience store, a school, and two bus stops at or near the . . . intersection and an increasing number of pedestrians cross . . . to patronize those facilities . . . d[id] not make the intersection a dangerous condition." (*Brenner*, at p. 441.) And in *Sun*, *supra*, 166 Cal.App.4th at p. 1190, the appellate court concluded that the City's installation of bulb-outs, which might have invited heavier pedestrian use, did not evidence a dangerous condition as a matter of law because "there is nothing about heavy pedestrian use that increased or intensified the danger to [the plaintiff] as she attempted to cross the street." The same is true here. Although schools and shops were near the intersection, and pedestrians might have used the crosswalk frequently, plaintiffs failed to identify any physical condition that made it unsafe to cross. Indeed, the accident occurred at night long after school hours, and no evidence suggested that the girls' presence at the intersection at 7:20 p.m. had any relation to the schools.[4]

---

[4] The majority refers to homes near the intersection or its residential nature. Although a citizen who voiced concerns about the intersection lived near it, plaintiffs' expert did not opine that residences near the intersection contributed to a physical defect in the property, and plaintiffs did not make such an argument. On the contrary, plaintiffs' expert focused solely on the presence of schools and retail shops at the intersection in relation to his theory on the lack of traffic gaps. As a result, no evidence suggested that residences near the intersection contributed to a dangerous condition of public property on the night of the accident. Indeed, the presence of schools and retail shops, in conjunction with the lack of traffic gaps, is the focus of the majority's analysis of dangerousness. Thus, its references to residences are outside the bounds of plaintiffs'

9

The majority also relies on plaintiffs' expert's opinion based on prior accidents at the intersection. "While there must be substantial similarity to offer other accident evidence for any purpose, a stricter degree of substantial similarity is required when other accident evidence is offered to show a dangerous condition; '"the other accident must be connected in some way with that thing"'" suggesting a physical defect in the property. (*Salas*, *supra*, 198 Cal.App.4th at p. 1072.) The expert maintained that rear-end accidents were similar to the one at issue, assuming that they occurred because a car hit a motorist stopped for a pedestrian, but neither the accident report used by the expert nor any other evidence supported that assumption. The expert also relied on two bicycle accidents and five automobile-pedestrian accidents in a 10-year period. According to the accident report, one of the bicycle accidents involved travel on the wrong side of the road, and two of the pedestrian accidents involved drivers who were turning at the intersection. Those accidents, therefore, do not have the requisite similarity to the one here. As to the remaining accidents, plaintiffs failed to connect them with any physical defect in the property under the circumstances of this case. (See *Sun*, *supra*, 166 Cal.App.4th at pp. 1187-1188 [prior accidents do not show dangerous condition when not connected to alleged physical defect claimed by plaintiffs to render the intersection dangerous with regard to automobile-pedestrian accident].) In any case, plaintiffs' evidence did not suggest the remaining accidents established a triable issue on dangerousness in light of the traffic volume on Laurel Canyon Boulevard and the 10 years examined. (See *Mixon*, *supra*, 207 Cal.App.4th at p. 138.)

The majority further cites the citizen's reported concerns about safety at the intersection and studies performed in relation to the intersection to support its conclusion that summary judgment was improper. If the intersection were determined to be dangerous, the citizen's reports might constitute evidence that the City was aware of the conditions; but the reports themselves do not establish a dangerous condition of public property. (*Sun*, *supra*, 166 Cal.App.4th at p. 1188 [citizen letters expressing concern

expert opinion and any argument made by plaintiffs. The references, therefore, do not support the reversal of summary judgment.

10

about public safety at intersection relevant to whether city had notice of potentially dangerous intersection but not competent evidence that intersection in fact was dangerous under statutory definition].) As for the studies performed on the intersection, one of them was done on the premise of expanding a school near the intersection and evaluated whether additional measures should be taken at the intersection in light of that expansion, with a particular focus on periods of "heavy" student use of the intersection before and after school hours—different from the time of the accident here, which occurred at 7:20 p.m. and with no indication that the girls were at the intersection because of the schools. That study thus did not suggest the intersection was dangerous as conditions existed on the night of the accident.[5] The other study suggested the intersection might be in line for safety improvement, but such an evaluation does not render the intersection statutorily dangerous. As noted, the potential to increase public safety by implementing additional precautionary measures does not prove the current condition is statutorily dangerous. (*Fredette*, *supra*, 187 Cal.App.3d at p. 132; *Dole Citrus*, *supra*, 60 Cal.App.4th at p. 494.)

Contrary to the majority's analysis, distinctions between this case and *Mixon*, *supra*, 207 Cal.App.4th 124, do not render summary judgment improper. As in *Mixon*, summary judgment was proper in this case because none of the features identified by plaintiffs, either considered individually or together, along with the accident history established a triable issue as to a dangerous condition of public property. The majority maintains that this case is more akin to *Cole v. Town of Los Gatos* (2012) 205 Cal.App.4th 749 (*Cole*). *Cole*, however, is distinguishable, because there evidence existed "from which a trier of fact could conclude that the third party conduct—at least the immediately injurious conduct, which was the act of driving off the road—was 'caused' by the characteristics plaintiffs cite as dangerous conditions." (*Id*. at p. 774.)

---

[5] Plaintiffs' expert faulted the City, particularly in relation to his theory of lack of traffic gaps, for not changing the intersection based on this study. The study, however, plainly related to measures to be undertaken based on the expansion of one of the schools near the intersection, not the current condition of the intersection.

The same is true of the other cases cited by the majority regarding the import of third party conduct on the dangerous condition analysis. Here, in contrast, the third party conduct—Leiner's failing to stop for the girls in the crosswalk—was not caused by any of the features plaintiffs claim were dangerous. In other words, the third party conduct was not connected to a physical defect in the condition of the property. Leiner saw the crosswalk and the girls on the corner; his failure to stop was not the result of a physical defect in the condition of the property.

In sum, I disagree with the majority's analysis and believe that it unnecessarily expands the limited statutory scope for liability for a dangerous condition of public property. I would affirm the judgment.

ROTHSCHILD, P. J.